John B. Stetson Company v. Commissioner.
John B. Stetson Co. v. Commissioner
Docket No. 2859-62.
United States Tax Court
T.C. Memo 1964-146; 1964 Tax Ct. Memo LEXIS 190; 23 T.C.M. (CCH) 876; T.C.M. (RIA) 64146; May 25, 1964
*190 The petitioner, a manufacturer and wholesaler of hats, acquired on March 29, 1954, the capital stock of Young's a corporation engaged in operating a chain of retail stores selling men's hats in the metropolitan area of New York City, which was the largest single retailer of petitioner's hats in the United States and accounted for nearly 50% of the sales of petitioner's hats in the metropolitan New York City area. For five previous taxable years, Young's had sustained net operating losses. On June 13, 1956, Young's was completely liquidated and dissolved, its assets (subject to its liabilities) being acquired by the petitioner upon liquidation. The petitioner in its income tax return for the taxable year ended October 31, 1956, claimed as a deduction the available net operating losses incurred by Young's. Held, that the petitioner's principal purpose for the acquisition of control of Young's was to preserve such corporation as a market and retail distributor of petitioner's hats and was not the evasion or avoidance of Federal income tax by securing the benefit of the deduction of Young's net operating losses, and that accordingly the petitioner is entitled to deduct Young's available *191 net operating losses. Sections 381 and 172 of the Internal Revenue Code of 1954. C. Walter Randall, Jr., Packard Bldg., Philadelphia, Pa., for the petitioner. Dennis DeBerry, for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax for the taxable year ended October 31, 1956, in the amount of $105,051.48. The sole issue presented is whether the petitioner may carry over and deduct from income earned by it in its taxable year ended October 31, 1956, net operating losses sustained in the taxable years ended December 31, 1952, December 31, 1953, and October 31, 1954, by a corporation acquired by the petitioner on March 29, 1954, and dissolved by it on June 13, 1956. Such issue is dependent upon the subsidiary issue of whether the petitioner's principal purpose for the acquisition of the other corporation was the avoidance of tax by securing the benefit of a deduction which it would not have otherwise enjoyed. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioner is a corporation organized under the laws of the Commonwealth of Pennsylvania, with *192 its principal place of business in Philadelphia, Pennsylvania. It keeps its books and prepares its returns on the basis of a fiscal year ending October 31, and on an accrual method of accounting. It filed its income tax return for the taxable year ended October 31, 1956, with the district director of internal revenue at Philadelphia. The petitioner's principal business is the manufacture and sale of hats at wholesale to approximately 10,000 independent retailers throughout the United States. It manufactures and sells two lines of hats, namely, "Stetson" hats, which are manufactured at Philadelphia and which comprise the major portion of its domestic shipments, and "Mallory" hats, which are manufactured at Danbury, Connecticut. The petitioner also manufactures hat bodies for domestic shipment and hats for shipment abroad. Over the years the petitioner has operated two retail hat stores in New York City (reduced to one in 1963) and one retail hat store in Philadelphia. For many years petitioner supplied hats to Young's Merchandising Corporation (hereinafter referred to as Young's), a New York corporation engaged in the operation of a chain of retail stores selling men's furnishings in *193 metropolitan New York City, there being 21 stores in this chain in March 1954. Prior to 1954 Young's was the largest of petitioner's 35 to 40 retail hat outlets in the metropolitan New York City area, accounting for almost 50 percent of the total sales therein, and in addition was the largest single retailer of petitioner's hats in the United States at that time. During the calendar years 1950 through 1953 the petitioner made estimated profits on its sales to Young's as follows: $157,000 in 1950, $92,000 in 1951, $107,000 in 1952, and $86,000 in 1953. Of the total hats sold by Young's, approximately 80 percent were manufactured by the petitioner, the remainder being manufactured by concerns not connected with the petitioner. In addition, at some undisclosed time, Young's commenced selling men's furnishings other than hats, such as ties and gloves, but sales of such items represented only a minor portion of its total sales. About the beginning of the year 1954 the petitioner learned that the two controlling stockholders of Young's, Max Young (then 60 years of age) and Jacob S. Brody (then 67 years of age), each of whom owned 2,358 7/8 shares of the 4,928 outstanding shares of Young's *194 common stock, were seeking to liquidate their interests. Brody, who was then Young's general manager, approached the petitioner's president, David H. Harshaw, to determine whether the petitioner would be interested in purchasing the stock of Young's. At that time Brody indicated that he would not continue in Young's management and that petitioner would have to get its own manager, but that he would be willing to stay on for a short time after any sale of Young's stock to the petitioner. The petitioner was desirous of preserving the Young's chain as an outlet for its hats in the metropolitan New York City area and considered that it would be an extreme hardship to lose an outlet with Young's sales volume. During the 1920's the petitioner had had the experience of having its then largest retail outlet in New York sold to a competitor, and the petitioner's management did not want this to happen again. The petitioner's president informed the executive committee of petitioner's board of directors at a meeting held on January 22, 1954, that petitioner's management had been concerned for some time regarding the financial instability of Young's and recommended a plan whereby petitioner's *195 management would be permitted to expend a sum not to exceed $100,000 for the purchase of the preferred and common stock of Young's in order to protect petitioner's interests. [1] He also informed the executive committee that if Young's was acquired a reorganization of that company would immediately be undertaken and that additional credit would have to be granted. [2] He further recommended a drastic curtailment of credit extended to Young's in the event Young's capital stock should not be acquired by petitioner. The executive committee adopted a resolution *196 recommending that the board of directors authorize petitioner's management to so negotiate for the acquisition of all of Young's capital stock. At its meeting of February 1, 1954, the petitioner's board of directors, after an explanation of the plan by the president and a discussion thereof, approved the recommendation of the executive committee regarding the purchase of Young's capital stock. At a meeting held February 26, 1954, the executive committee authorized petitioner's officers to enter into necessary commitments for the acquisition of Young's capital stock and to make arrangements for the employment of Max Young for such term and at such compensation as they deemed best. Negotiations were carried on between the petitioner's president and Brody and Young, which resulted in the execution of a "Memorandum of Agreement" dated March 2, 1954. Therein, and in attachments thereto, the petitioner authorized Brody and Young to make an offer on its behalf to the stockholders of Young's to purchase from them their preferred stock (including accrued dividends thereon) for $20 per share and their common stock for $5 per share, provided 100% of the outstanding shares of each class of stock *197 was deposited with a specified depository. As indicated, Brody and Young together owned 4717 3/4 shares of the 4928 shares of outstanding common stock. However, they owned only a small part of the outstanding preferred stock. They agreed that if less than 100%, but at least 80%, of the outstanding shares of each class was deposited, the petitioner had the right, within 5 days, to purchase all of the deposited shares for the same prices per share. [3]
The petitioner agreed that if it purchased Young's capital stock pursuant to the offer, it would cause Young's to enter into an employment agreement with Brody upon mutually agreeable terms and that it would enter into an agreement with Young whereby it would employ Young for a period of three years to act in a consulting and advisory capacity with respect to sales, promotional and advertising activities of the petitioner at an annual *198 salary of $5,000 plus traveling expenses. Young agreed that he would neither engage in the retail hat or haberdashery business nor grant the right to use his name in any such business in the New York City area for a total period of five years. The petitioner's offer, as above set forth, would result in a total purchase price of $82,710 based on the number of outstanding shares of common and preferred stock. The offering price per share was calculated upon the basis of book values. Young's consolidated balance sheet reflected a net book value for the consolidated Young's chain of $143,084.62 as of December 31, 1953, and of $102,210.09 as of March 31, 1954. However, prior to arriving at the aggregate offer of $82,710 for Young's capital stock, representatives of the petitioner made a physical examination, although not a complete physical inventory, of the Young's stores. Such representatives concluded, and Brody agreed, that Young's inventory was overvalued on its books by approximately $20,000, due to age of such inventory. Accordingly, book value was reduced for purposes of calculating the offering price for the stock. Young's had incurred operating losses in the 5 calendar years immediately *199 preceding 1954 in the following amounts: $41,986.58 in 1949; $77,993.71 in 1950; $34,850.79 in 1951; $72,459.50 in 1952; and $59,089.27 in 1953. At the time the petitioner made its offer for the purchase of Young's stock, it was aware that Young's had incurred operating losses for several years prior to 1954. However, at no time during the negotiations between the representatives of the petitioner and the representatives of Young's stockholders for the purchase of Young's stock was any reference made to any potential value of such stock on account of the availability of such losses as a net operating loss carryover for tax purposes. In response to petitioner's offer to purchase Young's capital stock, all of the shares of Young's stock, except 1/5 of a share of common stock, were deposited by its stockholders with the depository within the specified time and on March 29, 1954, petitioner consummated the purchase of the deposited shares by payment, in cash, of $58,070 for 2,903 1/2 shares of preferred stock (at $20 per share) and $24,639 for 4,927 4/5 shares of common stock (at $5 per share), or a total price of $82,709. The petitioner acquired the remaining 1/5 share of common stock *200 on October 25, 1954, by purchase, for $1. In the petitioner's annual report for 1954, its president informed stockholders, under date of January 17, 1955, of the acquisition of Young's with the explanation that the action was taken in order to insure the continued presentation of its hats in the important New York City market. Young's had kept its books and prepared its income tax returns on a calendar year basis prior to the acquisition of its stock by the petitioner in March 1954, but thereafter it changed its accounting and taxable year to a fiscal year ending October 31. Young's incurred an operating loss of $35,457.87 in the period from January 1, 1954 to March 31, 1954, making aggregate operating losses of Young's of $321,817.72 from January 1, 1949 to March 31, 1954. At the time of the acquisition of Young's stock in March 1954 it was the petitioner's intention to keep the stores in the Young's chain operating and selling petitioner's hats. However, being primarily a manufacturer and wholesaler, and not wishing to antagonize the retailers which sold its hats, the petitioner hoped to sell the Young's stores to parties who would be friendly to it and who would continue to sell *201 its hats. In the meanwhile, until the petitioner could locate a purchaser or purchasers of the Young's stores, it attempted to operate such stores profitably and to this end it made a thorough analysis of all of the Young's stores. As a result of this study it was determined that some of the stores could be sold to managers of Young's stores who would continue to sell petitioner's hats and that some of the stores were unprofitable and should be closed. In June 1954 the petitioner anticipated that two stores would be sold and two closed by the end of that month, that one store would be closed in July 1954, and that the leases of six more stores would be terminated and the stores closed during the next two years, thus reducing the total number of Young's stores to ten. During 1954 three stores were sold to former managers of Young's (in May, July and August), one store was sold to an unrelated party (in August), and three stores were closed (in April, June, and October). No stores were sold in 1955 or 1956. Young's opened a new store in September 1956. After its acquisition of the Young's stock the petitioner caused the stores to reduce inventories by removing the old merchandise. It *202 also expended money in improving the stores it expected to retain. In June 1954 officers of the petitioner learned that Joseph Fischer, who was the owner and operator of three hat stores in the Bronx, New York, and who had been a purchaser of petitioner's hats for many years, was interested in acquiring the Young's chain. The petitioner's officers, believing that the acquisition of the chain by Fischer would keep the stores in friendly hands, approached him with respect to the sale of Young's stock to him. On June 23, 1954, petitioner's management approved and reduced to writing a preliminary plan for the sale of the Young's stock to Fischer. Such plan contemplated that Fischer would put $50,000 into Young's as working capital, to be evidenced by a ten-year debenture note bearing interest at four percent, and that the petitioner would enter into an agreement with Fischer for him to purchase all of Young's stock for a minimum of $150,000 and a miximum of $200,000, payable anqually over a ten-year period. Petitioner's management recommended that it enter into such an agreement with Fischer and turn over the operation of the stores to Fischer as soon as possible, but that it not officially *203 sign any agreements until October 1 in order that gain on the transaction would qualify as a long-term capital gain. By letter dated June 25, 1954, the petitioner outlined to Fischer a method whereby he could acquire Young's capital stock, namely, by putting $50,000 into Young's as working capital and agreeing to purchase Young's stock from petitioner for $200,000 payable over a ten-year period. Thereafter negotiations were held between Fischer and representatives of the petitioner at several meetings. Fischer felt that the purchase price was too high in view of his accountant's analysis of Young's statement of operations and the reduction in the number of stores in the Young's chain from 21 to 15. During such negotiations the existence of Young's available net operating loss was not discussed. At a meeting held on September 13, 1954, the petitioner's board of directors approved the sale of Young's stock to Fischer. An agreement for such sale was drafted by the petitioner in the form approved by its board of directors and approved by Fischer and his attorney. The draft provided that Fischer would buy and petitioner would sell Young's capital stock for $100,000, payable by $50,000 cash *204 at settlement and the balance in annual payments of $5,000 for ten years, each payment to be evidenced by a non-negotiable promissory note. The stock was to be delivered as the purchase price was paid. Such draft further provided that the petitioner would cause Young's to engage the petitioner to render advisory services to Young's with regard to advertising, inventory control, and operations for a period of 6 years from settlement at an annual compensation of $12,500. The drafted agreement was not signed by either party, and subsequently the negotiations for the sale broke down, which fact was made known to the executive committee of petitioner's board of directors at its October 1, 1954, meeting. Fischer notified the petitioner that he was not going to consummate the sale, one reason given being that the purchase price was still too high in view of the accountant's analysis of the operations statements and the fact that the Young's stores were losing money at the time. After the breakdown in the negotiations, Fischer continued to purchase hats from petitioner for sale in his stores. On October 22, 1954, Young's caused its five wholly-owned subsidiaries [4] to be completely liquidated *205 and dissolved and their assets distributed to itself as sole stockholder. Brody remained in the employ of Young's as president and general manager until September 1, 1955. On June 13, 1956, petitioner caused Young's to be completely liquidated and dissolved, and all its assets, subject to its then existing liabilities, were transferred to petitioner. Young's balance sheet as of June 16, 1956, reflected total assets of $331,624.10 and total liabilities of $191,463.62, of which amount $146,256.29 was owed to the petitioner. Thereafter the Young's stores were operated as a division of the petitioner. During the year 1957 two new stores were opened and three stores were closed; during 1958 one store was closed; during 1960 one store was closed and one was sold to a former Young's manager; during 1961 two stores were closed and one was sold to a former Young's manager; and during 1962 one store was closed, one store was sold to a former Young's manager, and three stores were sold to unrelated parties. This left only three stores, and by July 31, 1963, two had *206 been closed and the third sold to a former Young's manager. During the entire period after the petitioner's acquisition of the Young's stock the Young's stores sold only the Stetson and related Mallory lines of hats. The petitioner treated the Young's stores like any other unrelated retailer, selling merchandise to them at its regular wholesale price and continuing to make credit advances to them on the same basis, and the price charged to the public by the Young's stores for petitioner's hats was the same as that charged by unrelated retailers. Commencing about 1957 sales of hats in neighborhood stores, such as the Young's stores, declined in New York City and throughout the United States. The operating profits or losses realized by Young's stores subsequent to March 31, 1954, were as follows: Period
Profit (or loss)
3/31/54 - 10/31/54
($ 52,033.39)
11/ 1/54 - 10/31/55
36,504.02
11/ 1/55 - 6/13/56
51,868.74
6/14/56 - 10/31/56 * *207 ( 47,295.00)
11/ 1/56 - 10/30/57 *
( 56,790.00)
11/ 1/57 - 10/31/58 *
( 48,395.00)
11/ 1/58 - 10/31/59 *
( 74,930.00)
11/ 1/59 - 10/31/60 *
( 82,702.00)
11/ 1/60 - 10/31/61 *
( 126,579.00)
11/ 1/61 - 10/31/62 *
( 115,632.00)
11/ 1/62 - 7/31/63 *
( 79,371.00)
In its return for its taxable year ended October 31, 1956, the petitioner reported taxable income, before net operating loss deduction, of $803,679.02 and claimed a net operating loss deduction of $202,022.08. In the notice of deficiency the respondent disallowed the claimed net operating loss deduction, determining it to be improper under the applicable laws and regulations. The petitioner's principal purpose for the acquisition of control of Young's was not the evasion or avoidance of Federal income tax by securing the benefit of a deduction which it would not otherwise enjoy. Opinion The petitioner contends that its acquisition of Young's assets upon the liquidation of that corporation on June 13, 1956, qualifies under section 381 of the Internal Revenue Code of 1954, [5] *208 that therefore it succeeded to Young's net operating losses, and that it is entitled, under section 172 of the 1954 Code, [6] *209 to deduct the available net operating losses of that corporation in computing its taxable income for its taxable year ended October 31, 1956. The respondent does not deny that the petitioner's acquisition of the assets of Young's by liquidation falls within the language of section 381, but it is his contention that the petitioner's principal purpose for the acquisition of the stock of Young's, slightly more than two years prior to the liquidation, was the avoidance of tax by securing the benefit of such *210 net operating loss deduction which it would not otherwise have enjoyed, and that, therefore, allowance of the deduction is precluded by section 269(a) of the 1954 Code. [7] The respondent does not contend that the net operating loss carryover deduction should be disallowed on the ground that the losses were sustained in a business different from that giving rise to the income, under the doctrine of Libson Shops, Inc. v. Koehler, 353 U.S. 382. [8]
*211 The respondent also contends that the aggregate of Young's net book value ($102,210.09) and the benefits of its available net operating losses (52% of $321,817.72, or $167,345.21) totaled $269,555.30 and is thus substantially disproportionate to the consideration paid by the petitioner for Young's stock ($82,710), and that this fact is, pursuant to section 269(c) of the 1954 Code, [9] *212 prima facie evidence of the principal purpose of avoidance of Federal income tax. The petitioner on brief admits that section 269(c) supports the respondent in his contention that a prima facie case was made out against it, but contends that it has rebutted respondent's prima facie case by establishing that its principal purpose for the acquisition of control of Young's was a valid business purpose in no way related to income tax avoidance or evasion. Upon consideration of the record as a whole, we agree with the petitioner. We are satisfied that the principal purpose for the acquisition of Young's stock by the petitioner was a bona fide business purpose, namely, to preserve Young's as a market and retail distributor of petitioner's hats in the metropolitan New York City area. As shown in our Findings of Fact, prior to 1954 Young's was the largest single retailer of petitioner's hats in the metropolitan New York City area, accounting for almost 50 percent of the total sales therein, and was also the largest single retailer of petitioner's hats in the United States. In early 1954 Young's general manager (who was also one of its *213 two controlling shareholders) approached the petitioner to determine whether it would be interested in purchasing the stock of Young's, since he and the other controlling stockholder wished to liquidate their interests in Young's and retire. The petitioner's president, David Harshaw, testified that the petitioner's sole purpose in acquiring Young's stock was to insure this source of distribution of petitioner's hats in the important New York City market and to not lose it to a competitor; [10] that the potential value of a net operating loss carryover deduction had no bearing whatsoever on petitioner's decision to acquire the stock of Young's; that any such potential value was never referred to in petitioner's negotiations for the acquisition; and that petitioner's intention was to insure that the Young's stores would continue to sell petitioner's hats, although it would prefer to have such stores operated by someone friendly to it, rather than operate them itself. Young's secretary, who was also a member of the law firm representing Young's, testified that during the negotiations in which he participated no consideration whatever was given to Young's net operating losses and that he *214 gained the impression during the course of the negotiations and events contemporaneous therewith that the reason that the petitioner was acquiring the stock of Young's was to protect the distribution of petitioner's hats in the metropolitan New York City area. Subsequent events tend to corroborate this testimony as to the purpose of acquisition. After acquiring Young's stock the petitioner analyzed all of the Young's stores in an attempt to operate such stores profitably and as a result determined that some of them should be closed and that some could be sold to Young's managers who would continue to sell petitioner's hats. Several of the stores were closed because they could not be operated profitably, and the rest were sold, 7 of them to former Young's managers. We note also, as some indication that utilization of the Young's net operating losses was not the petitioner's principal purpose, that within a few months after the petitioner's *215 acquisition of the stock of Young's it approached and entered into serious negotiations for the sale of the stock to one of its retailers, Joseph Fischer. Such negotiations led to the drafting of an agreement of sale embodying terms approved by both the petitioner and Fischer. However, Fischer subsequently declined to sign the agreement because he concluded that the purchase price was too high. The respondent takes the position that petitioner must have considered the tax benefits in connection with the acquisition, in view of the facts that petitioner admittedly knew that Young's had been losing money for several years, that it had seen Young's balance sheet and statement of operations for the year 1953, that Harshaw testified in effect that petitioner was familiar with the volume of business done by each of Young's stores and knew which of such stores were losing money, that Harshaw was a "tax-aware" businessman, that petitioner was represented in the acquisition by a law firm which included counsel familiar with tax matters, and that tax matters were considered in connection with the proposed sale of Young's stock to Fischer. As stated, the testimony is to the effect that tax considerations *216 were not discussed in connection with the acquisition of Young's stock and had no bearing upon petitioner's decision to acquire Young's stock. But even if one of the purposes of petitioner was to obtain the benefit of the deduction of Young's net operating losses, we are satisfied that such was not its principal purpose. See Hawaiian Trust Company, Limited, v. United States, (C.A. 9) 291 F. 2d 761; and Berland's Inc. of South Bend [Dec. 18,057], 16 T.C. 182. In the Berland's case, we stated in part: It is true that the tax consequences of Berland's reorganization were considered prior to the execution of the plan and that a limited benefit resulted. The statute does not forbid such consideration. Rather, the question under the statute is - was tax avoidance "the principal purpose" of Berland's actions? * * *
The consideration of the tax aspects of the plan was no more than should be expected of any business bent on survival under the tax rates then current. Such consideration is only the part of ordinary business prudence. It does not follow automatically from the fact that tax consequences were considered, that tax avoidance was the principal purpose of Berland's organization of *217 the petitioning corporations. On the record, we have found to the contrary and that such was not the principal purpose. * * * The respondent also argues that where, as here, a corporation with large profits acquires control of a corporation with current, past or prospective net operating losses and the acquisition is followed by such transfers or other action as is necessary to bring the deduction thereof into conjunction with its income, it is indicative that the principal purpose for acquiring control was avoidance of Federal income tax, citing section 1.269-3(b)(1) of the Income Tax Regulations. We note that such regulation provides that such a transaction is ordinarily indicative of a principal purpose of tax avoidance absent evidence to the contrary. In the instant case, as previously stated, there is substantial evidence showing that tax avoidance was not the principal purpose of the acquisition. In view of the foregoing, we have concluded and have found as a fact that the petitioner's principal purpose for the acquisition of control of Young's was not the evasion or avoidance of Federal income tax by securing the benefit of a deduction which it would not otherwise enjoy. It *218 follows that the respondent was in error in disallowing the claimed net operating loss carryover deduction. Decision will be entered under Rule 50. Footnotes
1. There was no detailed written plan for the purchase of Young's capital stock at this time, but the petitioner's president expected that such a plan would be worked out in negotiations with Brody and Young. At some time within 1 to 3 years prior to 1954 the petitioner had paid part or all of the cost of a business consultant's review of Young's which was made in order to try to revive that company. ↩
2. During the period April 30, 1952 to March 31, 1954, the monthly balance owed by Young's to petitioner on open account by reason of indebtedness incurred for hats sold at wholesale to Young's by petitioner varied from $73,548.34 to $203,330.30.↩
3. A partner in the law firm which then acted (and is acting in the instant case) as counsel for the petitioner notified petitioner's vice president and treasurer by letter dated March 3, 1954, of the procedural arrangements made for purchasing the stock if petitioner's offer was accepted by Young's shareholders.↩
4. Young's Sales Corporation; Tropiker Hat Corporation; Young's Hats, Inc.; Young Brothers, Inc.; and Hattrop Realty Corporation.↩
*. While operated as a division of petitioner.
5. Section 381 provides in pertinent part as follows: (a) General Rule. - In the case of the acquisition of assets of a corporation by another corporation - (1) in a distribution to such other corporation to which section 332 (relating to liquidations of subsidiaries) applies, except in a case in which the basis of the assets distributed is determined under section 334(b)(2); * * *
the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c). * * *
(c) Items of The Distributor or Transferor Corporation. - The items referred to in subsection (a) are: (1) Net operating loss carryovers. - The net operating loss carryovers determined under section 172↩, * * *. 6. Section 172 of the 1954 Code provides in pertinent part as follows: (a) Deduction Allowed. - There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * *. (b) Net Operating Loss Carrybacks and Carryovers. - (1) Years to which loss may be carried. - A net operating loss for any taxable year ending after December 31, 1953, shall be - * * *
(B) a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss. * * *
(g) Special Transitional Rules. - (1) Losses for taxable years ending before January 1, 1954. - For purposes of this section, the determination of the taxable years ending after December 31, 1953, to which a net operating loss for any taxable year ending before January 1, 1954, may be carried shall be made under the Internal Revenue Code of 1939. Section 122(b)(2)(B) of the Internal Revenue Code of 1939 provides in part as follows: Loss for taxable year beginning after 1949. - If for any taxable year beginning after December 31, 1949, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five proceeding taxable years * **.↩
7. Section 269(a) of the Code provides in part as follows: In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly. control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person * * * would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * *. ↩
8. See Rev. Rul. 58-603, 1958-2 C.B. 147, and Rev. Rul. 59-395, 1959-2 C.B. 475, in which the Internal Revenue Service stated that it would not rely upon the principle of the Libson Shops case as to transactions described in section 381(a) of the Internal Revenue Code of 1954↩.
9. Section 269(c) provides as follows: Presumption in Case of Disproportionate Purchase Price. - The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate - (1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.
10. In this connection Harshaw testified, and we have found as a fact, that petitioner's management was aware that during the 1920's the then largest retailer of its hats in New York was sold to a competitor and that it did not want to let this happen again.↩