**SCROLL, INC., a Florida Corporation, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 29207.**

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1971.

---

John L. Britton, Marc Lipsitz, Carmen A. Accordino, Feibelman, Friedman, Hyman & Britton, Miami, Fla., for petitioners-appellant.

K. Martin Worthy, Chief Counsel, Daniel J. Boyer, Atty., Internal Revenue Service, Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Elmer J. Kelsey, Gordon S. Gilman, Meyer Rothwacks, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before JOHN R. BROWN, Chief Judge, and WISDOM and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Like so many of the contests between aggrieved taxpayers and the Internal Revenue Service, this one hinges upon the vagaries of motive and intention underlying an otherwise unexceptionable corporate transaction. Specifically, we must decide whether a desire to avoid payment of Federal income taxes was the principal purpose behind the acquisition of a loss corporation with a high net operating loss carryover and its subsequent merger with a business having taxable income against which these losses could be offset.[1] Both the Commis-

---

1. Simply stated, the record reveals that on October 31, 1961 Keller Industries (Keller) acquired all the stock of Scroll (Taxpayer), a corporate subsidiary of Miami Window Corporation (Window). Then, in January 1962, Keller's high-profit subsidiary, Aluminum Chair Products Corporation (Chair), was merged into Scroll, thereby bringing into conjunction high tax losses and high taxable income.

sioner and the Tax Court determined that it was and accordingly disallowed the deduction under § 269 of the Internal Revenue Code.[2] We affirm.

For the most part the Tax Court's findings of fact are stipulated, and many others are undisputed. But on the critical issue of subjective motivation we have to recognize that the fact as found has no express verbal testimony to support it, and it has to rest on inferences that at least offer a choice—a choice the fact-finder made.

Scroll is a Florida-based corporation which since 1957 has been engaged in the design, manufacture and sale of cast aluminum furniture and other metal products. Initially it was a wholly owned subsidiary of Window, but by June 1959 Window's financial condition had deteriorated to such an extent that its majority stockholder, Robert Russell, assumed direct control of its operations, consolidating profitable activities and disposing of those that were losing money. Scroll sustained large operating losses both before and after Russell took over[3] and consequently was a prime candidate for disposition, particularly since Window also needed cash with which to buy up its outstanding bonds at substantial (65%) discounts.

However, Scroll's cast or wrought aluminum furniture products continued to enjoy favor in the trade because of their appearance and style. Capitalizing on this fact, Russell ejected the old management and in March 1960 hired a new general manager with some thirty-five years of experience in the furniture field. After a three month study he advised Russell that the business had the potential for making a profit. Though in deep financial straits at this point, Scroll was in no danger of going under.

Beginning in March or April of 1961, by which time Scroll had started to turn the financial corner, Russell initiated discussions with the predecessor of Keller with the aim of an ultimate sale. Although such a transaction had been discussed by representatives of the two companies as early as 1959, the negotiations do not appear to have been too serious since Keller seemed to believe that Russell was in the better position to inject renewed vigor into Scroll's operations and to reverse its declining corporate health. Consequently, prior to the 1961 meeting, Scroll had used extensive newspaper and high quality magazine advertising, hired design engineers, and under new management started to display its furniture in various showrooms around the country. The principal success was in tightening quality production, reducing losses and injury to reputation from faulty goods, and eliminating unprofitable items.

When the March 1961 negotiations—in no way a continuation of the 1959 discussions—commenced, Scroll was still a loss corporation, but indications were that it might eventually prosper because

2. 26 U.S.C.A. § 269:
"Acquisitions made to evade or avoid income tax
(a) *In general.*—If * * *
(2) any corporation acquires * * * directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance."

3. Scroll's accumulated net operating loss by the end of taxable year 1961 amounted to $596,799.15:

| Taxable Year Ended | Loss |
|---|---|
| February 28, 1958 | $ 1,362.03 |
| February 28, 1959 | 299,630.96 |
| February 29, 1960 | 241,796.11 |
| February 28, 1961 | 55,654.74 |
| Total Losses | $598,443.84 |
| Less: Profit for period 3/1/61–7/31/61 * | 1,644.69 1,644.69 |
| Accumulated Net Operating Loss Carryover | $596,799.15 |

* Prior to its acquisition by Keller, Scroll's taxable year ended on the last day in February. Scroll filed a return for the partial year ending July 31, 1961.

by that time it had achieved a monthly profit of $1,000. In any event it was not on the brink of insolvency or otherwise facing imminent financial disaster.

From the beginning of the 1961 discussions with Keller, Russell's position was that he would accept nothing less than the net book value of Scroll's assets. An audit was conducted, and in July of 1961 Keller agreed to purchase all of Scroll's stock on Russell's terms. The sale was made in October of 1961, backdated to July 1961, with the purchase price consisting of an assignment of certain of Scroll's accounts receivable to Window and a non-interest bearing promissory note which Window assigned to one of its principal and pressing creditors. This note was ultimately paid at maturity in April 1963.

After the sale Scroll's operations continued much as they had before, except for the addition of several benefits resulting from its affiliation with Keller. Keller's purchasing agents enabled Scroll to obtain aluminum castings from Japan at savings of 30%. Backed by the vastly superior economic strength of its parent Keller, Scroll opened two new showrooms and greatly expanded its advertising campaign. None of the advances would have been possible under the conditions existing at Window.

But from a sequential standpoint the acquisition of Scroll by Keller was only the first of two steps. On January 31, 1962 Chair, another of Keller's wholly owned subsidiaries engaged in the manufacture of tubular aluminum furniture at Waynesboro, Georgia, was merged into Scroll. As the surviving corporation, Scroll continued to operate what were for all practical purposes two separate and independent divisions—one marketing cast aluminum furniture (the old Scroll) and the other manufacturing tubular aluminum furniture (the former Chair). Each division continued to maintain separate plants under separate management while manufacturing substantially different kinds of aluminum furniture products.[4]

One of the most obvious advantages accruing to Keller and Chair as a result of the merger was the possibility—obviously anticipated by its corporate management, if not by its accountants and attorneys—of offsetting Scroll's substantial pre-acquisition net operating loss carryover against Chair's even more substantial post-acquisition profits.[5] As a direct result of the merger, Keller and Chair obtained the benefit of a substantial loss carryover that neither would otherwise have enjoyed.[6]

4. The fact that there was no real integration of operational or managerial functions bears strongly on the issue of principal purposes, insofar as it suggests that

"the transaction was not undertaken for reasons germane to the conduct of the business of the taxpayer." Income Tax Reg. § 1.269–2(b).

5. The total combined taxable year 1962 profits were $1,011,595.25, of which only $34,954.25 was attributable to the Scroll division. The disproportionate size of the two operations is indicated by the following figures:

POST-MERGER NET SALES

| Fiscal Year Ended July 31 | Chair Products Division | Scroll Division | Scroll Division's Percent of Combined Net Sales |
|---|---|---|---|
| 1962 | $5,318,893 | $ 538,658 | 9.2% |
| 1963 | 5,859,102 | 549,985 | 8.6% |
| 1964 | 7,397,575 | 664,127 | 8.2% |
| 1965 | 7,425,258 | 756,151 | 9.2% |
| 1966 | 6,272,595 | 841,048 | 11.8% |
| 1967 | 6,368,824 | 859,605 | 11.9% |
| 1968 | 6,128,171 | 1,086,083 | 15.1% |

6. In absolute terms, utilizing the applicable tax rate of 52%, the dollar value of the tax benefit acquired was $310,335.56.

But there is additional evidence credited by the Tax Court that other non-tax purposes also motivated the transaction. One of these was a purported desire to relieve Chair of the burden of Georgia income taxes, and one of the ways this could be accomplished was by its merger with a corporation having out-of-state activities. Another was the ostensible wish to utilize the superior marketing expertise of Robert Crockett, Chair's chief executive, in Scroll's behalf. Among his other efforts, Crockett placed catalog advertising for Scroll's products.[7]

In its return for the taxable year ending July 31, 1962 Scroll attempted to deduct its entire pre-acquisition net operating loss against the combined post-acquisition profits of the Scroll and Chair divisions (see notes 3 and 5, *supra*). The deduction was disallowed in its entirety.

■ We begin our analysis with the observation that the merger of a loss corporation with a profit-making one, even when the losses, profits and resultant tax benefits are all considerable, will not automatically invalidate a loss deduction under the Internal Revenue Code of 1954. Congress has not dictated an across-the-board disallowance of all tax benefits in such circumstances, and the mere fact that taxes otherwise payable were eluded by legitimate corporate maneuvering or manipulation is not conclusive. Failing to recognize this simple legislative truth, we might be led to infer an absolute prohibition where only a conditional one is imposed.

The condition, of course, is that the "principal purpose" underlying the acquisition must be the avoidance or evasion of taxes in order for § 269 to come into play.[8] And by this Congress intended § 269 to "be operative only if the evasion or avoidance purpose outranks, or exceeds in importance, any other one purpose." S.Rept. No. 627, 78th Cong. 1st Sess., reprinted in 1944 C.B. 973, 1017.[9]

■ Certainly we must recognize that as a matter of common sense and business acumen experienced corporate executives and their advisers may legitimately attempt to surround the proposed maneuver with factors which maximize at least one of the legitimate business purposes beyond the hope or expectation of the tax purpose. But equally as certain the key to this thorny problem of subjective intent does not lie in methodically characterizing all of the taxpayer's asserted non-tax motives as spurious. Whether legitimate business purposes did in fact induce the transaction, and if so to what extent, whether they were mere window dressing or afterthoughts, or whether the tax-saving purpose outranked any one of the credited business motives are all questions of fact upon which the taxpayer has the burden. American Pipe & Steel Corp. v. Commissioner of Internal Revenue, 9 Cir., 1957, 243 F.2d 125, cert. denied 355 U.S. 906, 78 S.Ct. 333, 2 L.Ed.2d 261. Unless clearly erroneous, the finding of the Tax Court must stand. Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218; 26 U.S.C.A. § 7482.

---

7. The Government apparently made no effort to discredit the testimony regarding either of these motives. There is no evidence to indicate whether substantial savings on Georgia taxes did result from the merger (nor what proportion such savings, if any, bore to the total benefits derived from the net operating loss deduction) or whether Crockett's efforts did materially enhance Scroll's competitive position.

8. Hawaiian Trust Co. Ltd. v. United States, 9 Cir., 1961, 291 F.2d 761; Mill Ridge Coal Co. v. Patterson, 5 Cir., 1959,

264 F.2d 713, cert. denied, 361 U.S. 816, 80 S.Ct. 57, 4 L.Ed.2d 63. John B. Stetson Co., 1964, 23 T.C.M. 876.

9. Similarly, the Income Tax Regulations, Section 1.269–3(a) (2), provide:
"If the purpose to evade or avoid Federal income tax exceeds in importance any other purpose, it is the principal purpose. This does not mean that only those acquisitions fall within the provisions of section 269 which would not have been made if the evasion or avoidance purpose was not present."

We think the facts provided both the Commissioner and the Tax Court with sufficient grounds for concluding that the acquisition and subsequent merger were motivated principally by tax avoidance considerations. Despite the plausible motives asserted by Taxpayer as having provided the primary impetus for the transaction, the totality of circumstances reasonably supports the inference that the potential tax benefit far outweighed any one of the other non-tax business reasons.

Whatever advantages (if any) Chair derived from the merger as a result of savings on Georgia corporate taxes were undoubtedly insubstantial when compared to the advantages Chair and Keller would derive from a reduction of taxable income by almost six hundred thousand dollars. As for the other benefits from Scroll's former viewpoint, arising from its affiliation with Chair's management and its superior marketing skill and purchasing power, there is nothing in the record even suggesting that these services could not have been utilized if both enterprises had continued their separate corporate existence—on the contrary, the fact that they were both subsidiaries of Keller allowed the trier of fact to conclude that these advantages would have been available even without a merger. Moreover, as the merger was one of corporate restructuring by means of an exchange of stock unaccompanied by any other substantial integration of management, physical facilities or opera-

tions, these reasons advanced to rationalize the maneuver were properly subjected to careful scrutiny.[10]

Regardless of whether these non-tax motives were actual or illusory, however, the practical effect of the entire transaction was to enable the corporation to set off substantial pre-acquisition losses against subsequent earnings and thereby to obtain a tax benefit not otherwise available. According to the Treasury Regulations,[11] such a result by itself indicates a tax-avoidance motive irrespective of whether any other evidence points to the proscribed principal purpose. And, contrary to Taxpayer's contention that the disallowance fails for want of verbal testimony linking (i) the initial acquisition of Scroll with (ii) the soon-to-follow merger of Chair into Scroll, the Tax Court was entitled to treat both acquisition and merger as interrelated steps in a single transaction. J. T. Slocomb Co. v. Commissioner of Internal Revenue, 2 Cir., 1964, 334 F.2d 269, 274.

There is a good deal of practical wisdom in the regulation, whether its principle comes from the mind of a Judge or the pen of a regulation redactor. A § 269 problem is not one of torts in which the judicial inquiry artificially cuts off at the moment of wrong. What was intended by such a merger-acquisition can properly be ascertained both by initial actions and those taken shortly thereafter, especially when the subsequent steps are so obviously necessary that they

---

10. Brown Dynalube Co. v. Commissioner of Internal Revenue, 4 Cir., 1962, 297 F.2d 915; 7 Mertens, Law of Federal Income Taxation § 38.69. See note 4, *supra.*

11. § 1.269–3 *Instances in which section 269(a) disallows a deduction, credit, or other allowance*

\*　　\*　　\*　　\*　　\*

(b) *Acquisition of control; transactions indicative of purpose to evade or avoid tax.* If the requisite acquisition of control within the meaning of paragraph (1) of section 269(a) exists, the transactions set forth in the following subparagraphs are among those which,

in the absence of additional evidence to the contrary, ordinarily are indicative that the principal purpose for acquiring control was evasion or avoidance of Federal income tax:

(1) A corporation or other business enterprise (or the interest controlling such corporation or enterprise) with large profits acquires control of a corporation with current, past, or prospective credits, deductions, net operating losses, or other allowances and the acquisition is followed by such transfers or other action as is necessary to bring the deduction, credit, or other allowance into conjunction with the income (see further § 1.269–6).

must have been in the minds of the strategists. The record here is undisputed that Keller's top management—including a former practicing certified public accountant—was aware in detail of this $600,000 loss carryover. We think a court experienced in the affairs of Federal income taxation was entitled to believe that no businessman in his right mind would allow this plum to go unplucked. To do nothing was to forsake forever the hope of a tax savings. To try, the structural change had to be made. If it worked, all was well. If it didn't, the try was worth the risk—indeed, there was no risk at all because what is here "lost" is what would have been paid had the game plan not been chosen. The burden of proof on the taxpayer is not an easy one, and when the disputed tax benefits are so disproportionate to the value of the other asserted advantages, that burden may be practically impossible to sustain. J. T. Slocomb Co. v. Commissioner of Internal Revenue, *supra*; Elko Realty Co. v. Commissioner of Internal Revenue, 3 Cir., 1958, 260 F.2d 949.

But in addition to all of this there is also § 269(c), [12] added by Congress in 1954 and establishing a specific objective guideline to assist the troublesome quest for the subjective. If the consideration paid in an acquisition is "substantially disproportionate" [13] to the aggregate of the adjusted basis of the property acquired and the tax benefit not otherwise available, that fact will constitute prima facie evidence of a principal tax avoidance purpose. Although the Tax Court found it unnecessary to apply the statutory presumption, we see no reason why this legislative declaration should not be carried out.

Giving full effect to the tax benefits —as hoped for or dreamed of by the corporate manipulators—it is undisputed that the purchase price paid was substantially "less than" [14] the aggregate value of assets and tax benefits acquired. On argument we were troubled about whether the ratio was to be based upon (i) full potential tax benefits or (ii) merely those attributable to the post-acquisition earnings of the operations of the former loss corporation. Of

12. (c) *Presumption in case of disproportionate purchase price.*—The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate—

(1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and

(2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition,

shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954.

See, H.Rep.No.1337, 83d Cong., 2d Sess., pp. 32, A66–A67 (3 U.S.C.Cong. & Admin.News (1954), pp. 4017, 4057, 4203–4204); S.Rep.No.1622, 83d Cong., 2d Sess., pp. 39, 228 (3 U.S.C.Cong.

& Admin.News (1954), pp. 4621, 4670, 4864); H.Conf.Rep.No.2543, 83d Cong., 2d Sess., pp. 32–33 (3 U.S.C.Cong. & Admin.News (1954), pp. 5280, 5292).

13. The words "substantially disproportionate" in this statute mean "substantially less than." S.Rep.No.1622, 83 Cong., 2d Sess., p. 228 (3 U.S.Code Cong. & Admin. News (1954), pp. 4621, 4865); Treasury Regulations (1954 Code), § 1.269–5.

14. It was stipulated that the price paid for the Scroll stock was less than the total of the book value of the assets acquired plus the potential tax benefit derived from its losses as shown by the following computation:

Book value of assets acquired
($235,256.80–$15,861.40)  $219,395.40
Potential tax benefit of net
operating loss ($596,799.15
at 52%  310,335.56
Total assets and benefits
acquired  $529,730.96
Percentage of cost to assets
and potential tax benefits
acquired  41.42%

course (ii) would more than reverse the ratio.[15] But our anxiety has been dissipated, because the stipulated figures are controlling.

As we have stated § 269(c) was added to eliminate some of the difficulties in demonstrating the proscribed motive. The problem was not that of denying the loss carryover respecting the post-acquisition income attributable to the operations of the former loss corporation.[16] The problem was the expected use of the whole carryover against all post-acquisition income of both acquired and acquiring entity. The stipulation (note 14, *supra*) was no slip of the pen or a tactical-strategic error to be regretted in the light of the Court's momentarily misguided anxieties. As most often true the pudding's proof is in the eating. And what Taxpayer sought was precisely the whole—$600,000 to wipe out 60% of Chair's $1 million profits quite with-out regard to Scroll Division's piddling $34,000. It was this (here unsuccessful) strategy that Congress meant to penalize when it established the markedly "less than" ratio as presumptive evidence of the forbidden motive.

We should sound this caveat. Of course we do not suggest that the Tax Court's inferences drawn from the facts in evidence are the only reasonable ones or even that they are more reasonable than any others. The taxpayer's evidence that its non-tax motives constituted the principal purpose for the acquisition and merger may provide a reasonable basis for a contrary inference and a different result. But the resolution of conflicts of this sort necessarily involves a factual inquiry into a subjective state of mind that resists direct and conclusive proof. The primary responsibility for this factual assessment lies with the trier of fact, Commissioner of Internal

15. Scroll's total net operating loss during the four taxable years immediately preceding the acquisition amounted to $596,799.15 (see note 3, *supra*). Applying this loss against only that portion of the post-acquisition profits directly attributable to the Scroll division's post-acquisition operations results in the following tax benefits and § 269(c) percentages:

| Taxable Year Ended | Scroll's Profits | Tax Benefit (Flat 52% rate) | Tax Benefit (Rate applicable to each separate year) |
|---|---|---|---|
| July 31, 1962 | $34,954 | | $12,676.08 |
| July 31, 1963 | 28,436 | | 9,286.72 |
| July 31, 1964 | 28,471 | | 8,100.29 |
| July 31, 1965 | 83,733 | | 27,281.06 |
| Total Profits | $147,515.74 | | |
| Tax Benefit at 52% rate | | $76,708.18 | |
| Tax Benefit at rate applicable to each separate year | | | $57,344.15 |
| Assets plus tax benefit | | $296,103.58 | $276,739.55 |
| Ratio of cost to assets | | $219,395.40 | $219,395.40 |
| plus tax benefits acquired | | 296,103.58 | 276,739.55 |
| Percentage of cost to assets plus tax benefits acquired | | (79.45%) | (85.01%) |

16. The Tax Court allowed (and the Government does not challenge) a deduction for FY 1962 of $34,954 which was the profit of Scroll Division for that year (see note 15, *supra*).

**620**

Revenue v. Duberstein, *supra*; Commissioner of Internal Revenue v. Heininger, 1943, 320 U.S. 467, 475, 64 S.Ct. 249, 254, 88 L.Ed. 171, 177, and we cannot say in light of all the circumstances that its conclusion here was clearly incorrect.

Affirmed.