The JUPITER CORPORATION and
Subsidiary Companies

v.

The UNITED STATES.

No. 70–76.

United States Claims Court.

Jan. 26, 1983.

Robert E. Kolek, Chicago, Ill., for plaintiff. Burton W. Kantor, Howard R. Koven, Harold J. Lipsitz, and Steven M. Brunner, Chicago, Ill., of counsel.

Robert N. Dorosin, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

In this case plaintiff seeks refunds of Federal income taxes it paid for calendar years ending December 31, 1965 and December 31, 1966, plus appropriate interest as provided by law. There are two issues to be resolved in this opinion: first, whether the Internal Revenue Service (IRS) improperly disallowed plaintiff's deduction in 1965 of certain net operating loss carryovers acquired from the 1964 liquidation of Elgin Gas and Oil Company (Elgin); and second, whether the IRS improperly classified amounts plaintiff received from a limited partnership in 1966 as the proceeds of a sale of a portion of plaintiff's partnership interest.[1]

Plaintiff was incorporated under Delaware law on July 12, 1961. Subsequently, all the assets and liabilities of Jupiter Oils, Ltd., a Canadian corporation, were transferred to plaintiff in exchange for plaintiff's stock and Jupiter Oils, Ltd., was liquidated. Prior to 1960, Jupiter Oils, Ltd. had been engaged primarily in the oil and gas business.

In 1960, Jerrold Wexler (Wexler) purchased a block of stock in Jupiter Oils, Ltd. that gave him effective control of the management and business operations of the corporation. Wexler's control carried over to plaintiff at the time Jupiter Oils, Ltd. was liquidated and Wexler remained in control of plaintiff throughout the tax years involved in this litigation. Under Wexler's control, Jupiter Oils, Ltd., and subsequently plaintiff, began an active program of acquisition and diversification as part of a long-range plan to build plaintiff into a large conglomerate corporation. Hereinafter the singular term "plaintiff" shall embrace both The Jupiter Corporation and its Subsidiary Companies.

---

1. Plaintiff's petition raised some 12 basic issues, embracing a number of subsidiary issues, regarding the propriety of various IRS determinations of deficiencies in plaintiff's tax returns for 1963, 1965, and 1966. At time of trial, settlement offers on 10 of these basic issues were pending before the Department of Justice, and, having received the favorable recommendation of defendant's trial attorney, it was considered reasonably probable that these issues would be so resolved. These settlement offers served to eliminate the taxable year 1963 for trial purposes. Therefore, trial was deemed necessary on only two of the 12 basic issues raised by plaintiff's petition involving the 1965 and 1966 taxable years. In pleading to the petition, defendant, *inter alia*, asserted a counterclaim alleging that plaintiff's payment of the assessed deficiencies did not include sufficient interest, an allegation denied by plaintiff in its responsive pleading. At trial, defendant withdrew its counterclaim, and the same was, and is, deemed stricken from defendant's pleading.

At the time Wexler acquired the controlling interest in Jupiter Oils, Ltd., his major area of experience was in commercial real estate development and Jupiter Oils, Ltd. was primarily engaged in the oil and gas business. Wexler's plan of acquisition and diversification therefore placed initial emphasis on the development of real estate projects and oil and gas resources. The two issues involved in this case arise, in part, from the acquisition by Jupiter Oils, Ltd. in 1961, under Wexler's control, of stock in Elgin, a gas and oil company, and from the construction in 1962–1964 of the Outer Drive East Building, a high rise residential-commercial building, by a limited partnership in which plaintiff's wholly-owned subsidiary was a general partner.

## I.

*Elgin's Net Operating Loss Carryovers.*

■ The Commissioner of IRS disallowed plaintiff's deductions in 1965 of net operating loss carryovers incurred by Elgin during the calendar years 1960 through 1964 on two grounds. First, the Commissioner claimed that plaintiff's deduction of Elgin's losses was properly disallowed under Internal Revenue Code (IRC)[2] section 269 because plaintiff acquired control of Elgin for the principal purpose of evading or avoiding Federal income taxes; and, second, the Commissioner disallowed the deduction of Elgin's net operating loss carryovers, in any event, because plaintiff had failed to substantiate the losses incurred by Elgin. These determinations by the Commissioner are endowed with a presumption of correctness. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Montgomery Coca-Cola Bottling Co. v. United States,* 222 Ct.Cl. 356, 365–66, 615 F.2d 1318, 1322 (1980); *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151, 510 F.2d 1365, 1369 (1975). Plaintiff has the burden of overcoming the presumption of correctness that attaches to these determinations of the Commissioner. After careful consideration

of all the evidence, as set forth in detail in the findings of fact, which have been provided the parties, it is concluded that plaintiff has failed to overcome the presumption of correctness of the Commissioner's determinations that plaintiff acquired control of Elgin for the principal purpose of evading or avoiding Federal income taxes, and that, in any event, it has failed to substantiate the losses claimed by Elgin in the calendar years 1960 through 1964.

### A. *Plaintiff's Acquisition of Elgin*

Jupiter Oils, Ltd. first acquired an interest in Elgin on March 30, 1961, when it purchased 373,000 shares of Elgin stock in exchange for $24,800 and 8,111 shares of Jupiter Oils, Ltd. stock. Immediately following this transaction, Elgin had approximately 15,000 shareholders with a total of 1,492,000 shares of stock outstanding. The stock Jupiter Oils, Ltd. acquired in this transaction constituted approximately 25 percent of Elgin's outstanding stock. The remainder of Elgin's outstanding stock was publicly held in relatively small individual quantities. At this time Elgin lacked effective management and operational leadership, and its books and financial records were poorly kept.

Jupiter Oils, Ltd.'s ownership of 25 percent of Elgin's outstanding stock gave it effective control of Elgin's management and business operations. Immediately after the acquisition of Elgin's stock, persons who were officers, directors or otherwise affiliated with Jupiter Oils, Ltd. constituted a majority of Elgin's board of directors.

Plaintiff acquired Jupiter Oils, Ltd.'s interest in Elgin in the latter half of 1961 when Jupiter Oils, Ltd. was liquidated into plaintiff. At all times thereafter, until Elgin's liquidation in 1964, plaintiff controlled Elgin's management and business operation through its ability to elect a majority of Elgin's board of directors.

---

**2.** All references to the Internal Revenue Code, 26 U.S.C., are to the 1954 Code, as amended, unless otherwise indicated.

By 1961, Jupiter Oils, Ltd. was actively engaged in a program of expansion and diversification. Jupiter Oils, Ltd. had been engaged primarily in the oil and gas business prior to 1960 and an expansion of its oil and gas operations was planned. The acquisition of Elgin's stock was part of this planned expansion. Jupiter Oils, Ltd. expected to build Elgin into a profitable oil and gas exploration and production company.

Subsequent to its acquisition of the assets and liabilities of Jupiter Oils, Ltd., plaintiff continued this program of expansion in the oil and gas business. On March 1, 1962, plaintiff merged with Commonwealth Oil Company (Commonwealth Oil), a profitable oil and gas corporation. Commonwealth Oil's operations were more extensive and diversified than Elgin's and its management staff was more experienced and organized than Elgin's. Plaintiff retained Commonwealth Oil's managerial staff and assimilated Elgin's operations into Commonwealth Oil's pre-existing organizational structure.

Plaintiff developed a plan to combine Elgin and several other corporations in which plaintiff owned interests into a corporate organization within which to build another large diversified public corporation similar to plaintiff itself. The success of this development plan was considered to be contingent on the preservation of an American Stock Exchange listing of one of the corporations which was to be combined with Elgin. When this American Stock Exchange listing was extinguished, the development plan was discarded in late 1962. Subsequently, plaintiff's plan to build a profitable oil and gas division centered on Commonwealth Oil rather than Elgin.

When Jupiter Oils, Ltd. acquired an interest in Elgin in early 1961, its officers were led to believe that Elgin's business operations could be profitably run. However, the data available for this belief was not complete nor entirely reliable, and reports of Elgin's potential oil resources were inadequate and too speculative. It was clear, however, that Elgin needed money, improved equipment, machinery and management if it hoped to be a profitable company. Elgin was not a profitable company in 1961 when Jupiter Oils, Ltd. acquired 25 percent of Elgin's stock. Elgin continued to operate at a loss in every year until it was liquidated in 1964.

Plaintiff advanced Elgin limited amounts of money to allow Elgin to continue its business operations. These advances were made initially on an informal, open-account system. Elgin's non-interest indebtedness to plaintiff was neither secured nor documented by formal promissory notes. By the end of 1963, plaintiff's books and records indicated that Elgin owed plaintiff $84,400 from these informal advances. At this time, plaintiff made a decision to obtain Elgin's stock in cancellation of this $84,400 indebtedness. This decision was part of a newly-formulated policy whereby plaintiff intended to make future advances to Elgin only in exchange for Elgin stock. The informal open-account system was terminated by plaintiff on December 31, 1963. The record supports an inference that this decision to obtain Elgin stock in repayment of indebtedness was the start of plaintiff's maneuvering to be in a position to utilize Elgin's large net loss carryovers at an appropriate time in the future.

Elgin did not issue any stock to plaintiff as consideration for plaintiff's cancellation of Elgin's $84,400 indebtedness until July 6, 1964. By this date, plaintiff had advanced an additional $22,225 to Elgin. Elgin issued 1,316,250 shares of its stock to plaintiff on July 6, 1964 in satisfaction of Elgin's total outstanding indebtedness as of that date. The issuance of these shares to plaintiff increased plaintiff's stock ownership to 1,684,250 shares, which comprised 61 percent of Elgin's total outstanding shares.

Plaintiff continued to advance Elgin money in exchange for relatively small quantities of stock during July, August, September, and November of 1964. Beginning in September, plaintiff began purchasing relatively small quantities of Elgin's issued stock from private shareholders. Also during this period, plaintiff transfer-

red 163,538 shares of Resource Ventures Corporation stock, one of plaintiff's subsidiary companies, to Elgin in exchange for 163,538 shares of Elgin stock. As of the end of November 1964 plaintiff had increased its Elgin's stockholdings to approximately 66 percent of Elgin's outstanding stock. On December 4, 1964, plaintiff increased its interest in Elgin to approximately 80 percent of Elgin's outstanding stock by exchanging 56 oil and gas leases for 2,034,042 shares of Elgin stock. Elgin was liquidated into plaintiff on December 31, 1964.

### B. *Section 269 of the Internal Revenue Code*

■ When "control" of a corporation is acquired for the "principal purpose" of evading or avoiding Federal income tax by securing the benefit of a deduction which the acquiring corporation would not otherwise enjoy, section 269(a) gives the Secretary of the Treasury discretionary authority to disallow the deduction.[3] Before it can be determined whether plaintiff was motivated by the principal purpose of avoiding taxation, the point in time when plaintiff acquired control of Elgin must be determined. As indicated by the Court of Appeals in *Hawaiian Trust Co. v. United States,* 291 F.2d 761, 768 (9th Cir.1961), section 269 does not apply if plaintiff developed a tax avoidance motive after control of Elgin was acquired for purposes other than tax avoidance:

> The determining factor * * * is the intention or purpose of [taxpayer] *at the time of acquisition.* [Taxpayer] having acquired control of [a corporation] for business reasons alone and without considering the tax aspects of the transac-

tion, the intention or purpose "for which (such) acquisition was made" would not be changed from a business into a tax evasion purpose when it subsequently ascertained the tax consequences of the transaction.

*See also Capri, Inc. v. Commissioner,* 65 T.C. 162, 178–79 (1975).

### (1) *Acquisition of Control*

■ With the acquisition in 1961 of approximately 25 percent of Elgin's outstanding stock, Jupiter Oils, Ltd. acquired effective control of Elgin's management and business operations. When plaintiff subsequently in 1961 acquired all the assets of Jupiter Oils, Ltd., it acquired effective control of Elgin. However, the acquisition of effective or actual control of a corporation's assets and its management is not necessarily an acquisition of control to which section 269 applies. Section 269 contains its own definition of control, as follows:

> Control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

Since Jupiter Oils, Ltd., and subsequently plaintiff, acquired only 25 percent of Elgin's outstanding stock on March 30, 1961, neither corporation acquired "control" of Elgin within the first part of the definition quoted above which requires an acquisition of at least 50 percent of a corporation's outstanding stock. Plaintiff cannot utilize the second part of the definition quoted above because there is not sufficient evidence in the record to determine the total value of all Elgin's outstanding shares at that time.[4]

---

**3.** Section 269(a) provides in part:

"(a) In general. * * * If * * *

"(1) any person or persons acquire * * * directly or indirectly, control of a corporation * * *.

"(2) * * *.

and the principal purpose for which such acquisition was made was evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary may disallow

such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation."

**4.** In its pretrial submissions, plaintiff claimed that the fair market value of the 25 percent block of Elgin's stock which it acquired in 1961 was at least 50 percent of the total value of all Elgin's outstanding shares because the 25 per-

Therefore, plaintiff did not acquire "control" of Elgin, within the statutory definition, in 1961 when it acquired its initial 25 percent interest in Elgin.

Plaintiff takes the position that it received control of Elgin, within the statutory definition, on December 31, 1963. In its briefs, however, plaintiff's discussion of its position is not persuasive. It does not cite any case law in support of its position nor does it provide any cogent analysis as to why its position should be adopted. It does cite Rev.Rul. 69–591, 69–2 C.B. 172 in support of its position that no significance should attach to the fact that Elgin did not issue stock certificates to plaintiff until July 6, 1964. However, that Ruling deals with a different provision of the Internal Revenue Code and different circumstances and thus lacks applicability, by analogy or otherwise, to the facts of this case. Plaintiff's books and records indicate that Elgin's outstanding indebtedness to plaintiff of $84,400 was cancelled and plaintiff's total investment in Elgin was increased by an equal amount on December 31, 1963. Plaintiff's treasurer testified that sometime in this period Elgin's management authorized the issuance of 844,000 shares of Elgin stock to plaintiff in exchange for plaintiff's cancellation of Elgin's indebtedness.[5] However, there is no evidence of the exact date this authorization was given. No stock was actually issued to plaintiff until July 6, 1964. When plaintiff acquired the ownership of these 844,000 shares, its percentage ownership of Elgin's outstanding stock increased over 50 percent. Elgin's management apparently did not consider plaintiff to have received an ownership interest in these 844,000 shares as of the end of 1963 because it reported on Elgin's 1963 Federal

tax return that no corporation, individual, partnership, trust, or association owned, directly or indirectly, 50 percent or more of Elgin's voting stock. It is concluded that plaintiff did not receive control of Elgin, within the statutory definition, on or before December 31, 1963.

Ownership of shares in a corporation is a contractual relationship created by the agreement and consent of the corporation and the shareholder. See Pacific Nat'l. Bank v. Eaton, 141 U.S. 227, 234, 11 S.Ct. 984, 985, 35 L.Ed. 702 (1891). In Don Johnston Drilling Co. v. Howard, 347 P.2d 640, 647 (Okl.1959), the court set forth the prerequisites for the creation of a shareholder's interest in a corporation as follows:

> When a corporation has agreed that a person shall be entitled to a certain number of shares for a consideration permitted by law and executed by the person, those shares come into existence and are owned by him.

In the present case, plaintiff's failure to prove when Elgin agreed to issue 844,000 shares to plaintiff in exchange for the cancellation of Elgin's indebtedness prevents a determination that these shares came into existence *prior to* the date the stock certificates were actually delivered to plaintiff, *i.e.,* July 6, 1964.

A stock certificate is merely "a muniment of title." *Don Johnston Drilling Co. v. Howard, supra,* 347 P.2d at 647. "[T]he issuance of the certificate is not a prerequisite to the acquisition of ownership." *Swenson v. Commissioner,* 309 F.2d 672, 674 (8th Cir.1962). *See also Hawley v. Upton,* 102 U.S. 314, 26 L.Ed. 179 (1880); *Babbitt v. Pacco Investors Corp.,* 246 Or.

---

cent block of stock gave plaintiff effective control of Elgin's operations. However, any determination of the total value of Elgin's stock based on the evidence in this record would be, at best, extremely speculative and, at worst, completely arbitrary. Apparently realizing its failure of proof, plaintiff in its post-trial submissions has neither proposed findings of fact on the question of the total value of Elgin's outstanding stock nor renewed its argument that plaintiff acquired more than 50 percent of the value of Elgin's outstanding stock in 1961.

5. Plaintiff's treasurer explained the delay in the issuance of stock to plaintiff as due merely to the failure of subordinate employees to act promptly on the authorization of Elgin's management to issue stock to plaintiff. In light of the length of the alleged administrative delay— over 6 months—and the extent of plaintiff's domination of Elgin's management, this explanation is not deemed persuasive.

| | | |
|---|---|---:|
| 1960 return | _ _ _ _ _ | $1,924,874 |
| 1961 return | _ _ _ _ _ | 5,911 |
| 1962 return | _ _ _ _ _ | 26,410 |
| 1963 return | _ _ _ _ _ | 29,137 |
| 1964 return | _ _ _ _ _ | 812,406 |
| | | $2,798,738 |

261, 425 P.2d 489 (1967). However, absent evidence to the contrary, the issuance of the stock certificates must be considered the event which creates an ownership interest in the corporation. "[W]hen there is nothing in the agreement of the parties to the contrary, the intent ordinarily is that a contract for the sale of stock is performed, and title to the shares of stock transferred upon delivery of the stock." *Hertz Drivurself Stations v. Ritter,* 91 F.2d 539, 541 (9th Cir.1937). Although plaintiff contends that Elgin intended to bestow title to 844,000 shares on plaintiff prior to July 6, 1964, the date when the stock certificates were actually issued, it has failed to support its contention with persuasive evidence. Therefore, it is concluded that plaintiff acquired the ownership interest represented by these shares on July 6, 1964.

██ Elgin issued a total of 1,316,250 shares to plaintiff on July 6, 1964, bringing plaintiff's percentage ownership of Elgin's outstanding stock to 61 percent. Since it was on this date that plaintiff's percentage ownership of Elgin's outstanding stock first equalled or exceeded 50 percent, plaintiff acquired control of Elgin, within the statutory definition, on July 6, 1964.[6] This is the date to be considered when examining plaintiff's contention that it did not acquire control of Elgin for the principal purpose of avoiding or evading taxation.

In its 1964 tax return, plaintiff reported its liquidation of Elgin on December 31, 1964, and set forth a schedule of the unused net operating loss carryovers of Elgin as follows:

### (2) *Principal Purpose of Acquisition*

With the date that plaintiff acquired control of Elgin established, the difficult and troublesome task remains of determining whether, on July 6, 1964, plaintiff acquired control of Elgin for the principal purpose of evading or avoiding Federal income taxes. The detailed findings of fact which accompany this opinion spell out the facts and circumstances germane to the acquisition of control by plaintiff of Elgin. No attempt will be made here to restate these voluminous findings. As in many involved tax cases, the myriad factual circumstances and the utilization of and convoluted references to financial data serve more often to confuse and obfuscate rather than enlighten relative to the crucial issue of motive and intent attendant to plaintiff's acquisition of control of Elgin.

Treasury regulations § 1.269–3(a) provide the following guidance for making the determination referred to above:

> If the purpose to evade or avoid Federal income tax exceeds in importance any other purpose, it is the principal purpose. This does not mean that only those acquisitions fall within the provisions of section 269 which would not have been made

6. In its pretrial submissions, plaintiff asserted, in the alternative, that even if it was not considered to have acquired 50 percent or more of Elgin's outstanding stock prior to July 6, 1964, the step transaction doctrine should be applied to collapse the latter acquisition of Elgin's stock into the initial acquisition in 1961. Plaintiff has neither renewed this argument in its post-trial briefs nor proposed findings of fact to support such an application of the step transaction doctrine. Moreover, the evidence produced at trial will not support a determination that the initial purchase of Elgin's stock in 1961 and the subsequent purchases in 1964 were closely related steps in a single plan the essential nature of which was to acquire over 50 percent of Elgin's outstanding stock. Plaintiff's plan in 1961 was to acquire effective control of Elgin for the lowest possible price, whereas its plan in 1964 was, according to the testimony of plaintiff's treasurer, to provide security for advances it had made to maintain Elgin's business operations over the previous 3 years. The record, as will be indicated later in this opinion, creates a rather strong inference that the decision by plaintiff to cover all loans to Elgin from late 1963 and thereafter by acquisition of equivalent Elgin stock was part of its maneuvering to acquire control of Elgin for purposes of obtaining the benefit of Elgin's net carryover losses. There appears to be no congruent relationship between the acquisitions of Elgin's stock in 1961 and 1964.

if the evasion or avoidance purpose was not present. The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, in connection with the tax result claimed to arise therefrom.

The determination of the principal purpose behind the acquisition of control of Elgin on July 6, 1964, is essentially a factual determination. *R.P. Collins & Co. v. United States,* 303 F.2d 142, 145 (1st Cir.1962). In cases such as this, this determination, of necessity, requires careful consideration of the motive and intent of top management officials of the acquiring company. *D'Arcy-MacManus v. Masius, Inc.,* 63 T.C. 440, 449 (1975). Too, inferences, because of the amorphous nature of motive and intent, play a greater role in cases such as this and thus make the job of the trier of fact an extremely difficult one. *See Scroll, Inc. v. Commissioner,* 447 F.2d 612, 614, 619 (5th Cir.1971); *Industrial Supplies, Inc. v. Commissioner,* 50 T.C. 635, 648 (1968). An examination of the entire circumstances surrounding plaintiff's acquisition of control of Elgin preponderates in favor of a finding that in late 1963 and thereafter plaintiff's primary and dominant motive and intent in acquiring such control was for the principal purpose of tax avoidance.

It is clear and uncontroverted from the evidence in the record that Jupiter Oils, Ltd., and subsequently plaintiff, were motivated primarily, if not exclusively, by valid business reasons when the initial interest in Elgin was acquired in 1961. Jupiter Oils, Ltd. and plaintiff acquired 25 percent of Elgin's stock in 1961 with plans to develop Elgin's oil and gas properties and to use Elgin as a vehicle for the development of a conglomerate corporation in much the same way that Jupiter Corporation, the plaintiff itself, was developing at that time. Plaintiff's principal officers testified convincingly that in 1961 plaintiff was expected to continue operating at a loss in the reasonable future while it carried out its plan of expansion and diversification. Plaintiff's management therefore did not envision any immediate benefit which could be obtained from the acquisition of Elgin's net operating losses at that time or the reasonable future. It was not until late 1963 that plaintiff could reasonably foresee that Elgin's net operating tax loss carryovers might be of benefit in 1965 when plaintiff's financial situation was expected to be considerably different than it was previously. Plaintiff, since 1961 (reported total income of $21,314.27 for the short taxable year July 12, 1961–December 31, 1961), had experienced significant growth. In 1963, plaintiff reported total revenues of $32,317,454, and on its 1963 income tax return reported gross profit of $9,618,248. In 1964, plaintiff reported total revenues of $69,769,739, and on its 1964 income tax return reported gross profit of $42,555,337. In 1965, plaintiff reported total revenues of $79,584,124, and on its 1965 income tax return reported gross profit of $43,451,984. It is also clear from the record that plaintiff's management, particularly its chief financial officer, was aware in 1961 and at all times thereafter of Elgin's large 1960 net operating tax loss carryover ($1,924,374), and was also aware of the fact that use of such a large loss carryover would expire after the 1965 tax year. Such awareness, while not controlling, certainly merits serious consideration in determining whether the acquiring corporation was motivated by tax avoidance in its corporate maneuvering. *See Scroll, Inc. v. Commissioner, supra,* 447 F.2d at 618; *J.G. Dudley Co. v. Commissioner,* 298 F.2d 750, 753 (4th Cir.1962); *Fawn Fashions v. Commissioner,* 41 T.C. 205, 213 (1963). *Compare D'Arcy-MacManus & Masius v. Commissioner,* 63 T.C. 440, 451–52 (1975).

After its initial acquisition of some 25 percent of Elgin stock in 1961, plaintiff made undocumented, non-interest loans to Elgin. As of the end of 1963, these loans totaled $86,100. Plaintiff's management decided to obtain Elgin stock in cancellation of this indebtedness. Further, it was also decided that any future advances to Elgin would only be made in exchange for Elgin stock. In this manner, plaintiff obtained additional shares of Elgin stock such that

by July 6, 1964, plaintiff owned over 61 percent of Elgin's outstanding stock and thus acquired control of Elgin within the purview of section 269(a). Thereafter, plaintiff continued to obtain additional shares of Elgin stock. As of November 1964, plaintiff owned 65.98 percent of Elgin's outstanding stock. In December plaintiff owned 80 percent of Elgin's outstanding stock thereby enabling plaintiff to liquidate Elgin and gain the benefit of its net operating loss carryovers. Such a series of stock acquisitions, during a period when no effort was made to develop Elgin and its only viable asset was its net operating loss carryovers, support an inference that tax avoidance was the principal purpose behind such maneuvering. See J.G. Dudley Company v. Commissioner, supra, 298 F.2d at 753; Industrial Suppliers, Inc. v. Commissioner, 50 T.C. 635, 646–47 (1968).[7] Plaintiff's treasurer openly testified that in August 1964, or thereabouts, plaintiff decided to liquidate Elgin, and the Elgin stock acquisitions by plaintiff during August 1964 and thereafter were clearly and admittedly conducted with the goal of increasing plaintiff's stockholdings in anticipation of Elgin's liquidation and acquisition by plaintiff of Elgin's net loss carryovers. It is not unreasonable or difficult, on this record, to conclude that this goal, purpose, and intent was clearly plaintiff's on July 6, 1964, a month or so previously, and inferentially was plaintiff's goal, purpose and intent since late 1963.

Plaintiff's stock activity in late 1963 and 1964, in conjunction with its expected need for additional net operating tax loss carryovers to reduce its anticipated otherwise taxable profit in 1965, creates a strong inference that tax avoidance was the dominant motive and the intent when it acquired control of Elgin in July 1964. Since a very large portion of Elgin's operating tax loss carryover, incurred in 1960, and totaling $1,924,873.94, would expire if not used in 1965, one is "entitled to believe that no businessman in his right mind would allow this plum to go unplucked. To do nothing was to foresake forever the hope of a tax savings * * *." Scroll, Inc. v. Commissioner, supra, 447 F.2d at 618.

Plaintiff stresses that its liquidation of Elgin in late 1964 was due to the financial threats posed by Federal Power Commission actions which, if they materialized, could, according to the testimony of plaintiff's treasurer, cause a financial drain on the corporation and indeed could put in issue plaintiff's very existence. In light of plaintiff's financial growth, at that time, the testimony of plaintiff's official in this regard is viewed as hyperbole. Plaintiff, according to the treasurer's testimony, embarked on cost-cutting measures to counter any future financial problems which included elimination of companies such as Elgin which were not profitable and served only as a drain on plaintiff financially.[8] The fact that plaintiff was at the time engaged in weeding out deadwood facets of its large conglomerate also fails to persuade that

---

**7.** Plaintiff refused during the period 1961–1964 to invest large amounts of money in Elgin to accomplish the capital and other improvements needed, and recommended by experts, to make Elgin a viable company. When plaintiff's plan to merge Elgin with other companies and develop another conglomerate failed in late 1962, plaintiff's interest in developing Elgin faded. As a result, no substantial effort was made during plaintiff's control of Elgin from 1961 and thereafter to rehabilitate Elgin's oil producing properties and they remained in poor operating condition until Elgin was liquidated in late 1964. While plaintiff explains this lack of attention and support for Elgin's welfare as due to its concern for development in its other acquisition areas, it also supports the view that Elgin's prime attraction to plaintiff was its

large, over $1 million, net operating tax losses. Elgin, during the period 1961–1964, had little else going for it. See American Pipe & Steel Corp. v. Commissioner, 243 F.2d 125, 127–28 (9th Cir.1957).

**8.** The record indicates that plaintiff was on notice since late 1962 that the Federal Power Commission was going to investigate the rates charged in the gas gathering operations which plaintiff had acquired in its merger with Commonwealth Oil Company on March 1, 1962. However, plaintiff's top officials testified it was not until August 1964 that they realized the potential financial ramifications of such investigations.

Elgin's liquidation was caused primarily by these events. Moreover, Elgin had been a drain on plaintiff since plaintiff took over in 1961. The inference is that 1964 was the appropriate time to take steps to be in a position to take advantage of Elgin's loss carryovers when, as anticipated, they would be needed in 1965. Such an inference comports favorably with the business instincts of plaintiff's president, Wexler, who stated in testimony that he "would take an option on a straw hat in winter because I never knew when I would need it." Elgin's net operating losses kept plaintiff and Elgin together until the need for the losses arose —which, in fact, turned out to be in 1965. The record as a whole supports a strong inference that liquidation of Elgin would have occurred in late 1964 absent any threat of action by the Federal Power Commission or cost-cutting measures by plaintiff.

Plaintiff relies principally on the testimony of its top management officials that it harbored no tax avoidance motive or purpose in acquiring control of Elgin. It goes without saying that the ascertainment of one's subjective intent or purpose motivating actions on his or her part is most difficult. *See Fawn Fashions v. Commissioner, supra,* 41 T.C. at 213. In delving into the subjective intent and motives of plaintiff's top management regarding the matter of tax avoidance, the inquiry must be based on objective facts which manifest this subjective intent. *Capri, Inc. v. Commissioner, supra,* 65 T.C. at 179. The self serving implications inherent in the testimony of these officials serves to reduce the weight to be accorded this testimony when considered in the light of the totality of the record. *See F.C. Publication Liquidating Corp. v. Commissioner,* 304 F.2d 779, 781 (2d Cir.1962). The objective facts in this record, and the inferences reasonably drawn therefrom, persuade that plaintiff's intent and motive in acquiring control of Elgin was for the primary purpose of obtaining

the benefit of Elgin's large net operating tax loss carryovers. Thus, the testimony of these officials, even if deemed uncontradicted, is not sufficient on this record, to overcome the Commissioner's determination that control of Elgin was motivated primarily by tax avoidance purposes. *See Geiger v. Commissioner,* 440 F.2d 688, 689 (9th Cir.1971), *cert. denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 90 (1971).

The record clearly establishes that plaintiff paid substantially less for Elgin stock than the adjusted basis of the Elgin property plus the value of Elgin's tax loss carryovers. Plaintiff paid about $221,777 for Elgin stock it owned as of July 6, 1964. Plaintiff's books and records indicate that its total investment in Elgin at the end of 1964 was $423,443.55. In July 1961, Elgin's balance sheet reported assets in access of $1 million. The record suggests that this figure is somewhat overstated. There is no reliable evidence in the record of the value of Elgin's assets as of late 1964. When Elgin was liquidated, plaintiff claimed the benefits of Elgin's $2,798,737.93 in net operating loss carryovers. Thus, for a total investment of $423,443.55, plaintiff acquired tax losses of over $2 million. Such circumstances also support an inference that tax avoidance was plaintiff's primary purpose in acquiring control of Elgin, particularly where no effort was made to develop Elgin's oil properties despite the reports of hired experts that such a course be followed, the unprofitability of Elgin's operation, and the drain of Elgin on plaintiff financially. *See Hart Metal Products Corp. v. Commissioner,* 437 F.2d 946, 951 (7th Cir.1971); *American Pipe & Steel Corp. v. Commissioner, supra,* 243 F.2d at 127–28.

■ Since plaintiff's purchase price for control of Elgin was substantially disproportionate to the aggregate of Elgin's assets and transferable deductions, the provisions of section 269(c) are also for consideration.[9] Section 269(c) holds that the cir-

---

9. Section 269(c) was enacted as part of the 1954 Internal Revenue Code, Pub.L. No. 591, August 16, 1954, 68A Stat. 80, and thus was operative during the years in issue. This sec-

tion was repealed by section 1901(a)(38) of the Tax Reform Act of 1976, Pub.L. No. 94–455, October 4, 1976, 90 Stat. 1771. It is worthy of note that one of the primary purposes of the

cumstances stated in the preceding paragraph constitute prima facie evidence of a tax avoidance motive. Defendant relies heavily on the presumption of tax avoidance set forth in this section. Contrary to the import of defendant's assertion of and reliance on, section 269(c) has been viewed more as a "procedural device" and not a conclusive presumption. *See Industrial Suppliers v. Commissioner,* 50 T.C. 635, 646 (1968); *H.F. Ramsey Co. v. Commissioner,* 43 T.C. 500, 517 (1965); *see also* note 9, *supra.* However viewed, this legislative declaration clearly is entitled to some weight in considering whether control was acquired principally for tax avoidance within the purview of section 269(a). *See Scroll, Inc. v. Commissioner, supra,* 447 F.2d at 618.

Plaintiff carries a heavy burden of proof in attempting to overcome the determination of the Commissioner that it acquired control of Elgin for tax avoidance purposes. *Scroll, Inc. v. Commissioner, supra,* 447 F.2d at 618; *American Pipe and Steel Corp. v. Commissioner, supra,* 243 F.2d at 126. The fact that plaintiff's situation also falls within the pale of the provisions of section 269(c), discussed above, adds further weight to the presumption of correctness which already exists in the determination of the Commissioner that plaintiff acquired control of Elgin for tax avoidance purposes. *Glen Raven Mills, Inc. v. Commissioner,* 59 T.C. 1, 16 (1972); *D'Arcy-Mac-Manus & Masius, Inc. v. Commissioner, supra,* 63 T.C. at 453. Plaintiff has failed to overcome this presumption and the Commissioner's determination must stand.

### 3. *Substantiation*

In the notice of deficiency, the Commissioner denied plaintiff's 1965 deduction of net operating loss carryovers required from the liquidation of Elgin in 1961 on the alter-

nate ground that plaintiff failed to substantiate the losses Elgin claimed in its 1960–1964 tax returns. This determination that plaintiff failed to substantiate the loss deductions is endowed, as indicated previously, with a presumption of correctness. *Welsh v. Helvering, supra,* 290 U.S. at 115, 54 S.Ct. at 9; *Montgomery Coca-Cola Bottling Co. v. United States, supra,* 222 Ct.Cl. at 366, 615 F.2d at 1322. To overcome this presumption, plaintiff has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination. * * * Once the taxpayer has met this burden the presumption disappears and the court must resolve the question upon the basis of all of the evidence before it." *KFOX, Inc. v. United States, supra,* 206 Ct.Cl. at 151–52, 510 F.2d at 1369; *see also Alterman Foods, Inc. v. United States,* 222 Ct.Cl. 218, 611 F.2d 866, 867–68 (1979). For the reasons set forth below, it is determined that plaintiff has failed to overcome the presumption of correctness which attaches to the Commissioner's determination on the matter of substantiation.

Plaintiff claimed the benefit of the following net operating loss carryover deductions, identified by the taxable year in which Elgin incurred them:

| Year Incurred | Amount of Loss |
|---|---|
| 1960 | $1,978,280.94 |
| 1961 | 5,910.71 |
| 1962 | 26,409.97 |
| 1963 | 29,137.03 |
| 1964 | 812,406.24 |

Elgin's entire 1960 net operating loss and the bulk of its 1964 net operating loss were reportedly caused by the abandonment or sale (at a loss) of oil and gas leases. No leases were abandoned or sold at a loss in 1961, 1962 or 1963.

Elgin's tax returns for the years 1960 and 1964 did not identify the leases which were reported as abandoned in those years. The

1976 Tax Reform Act was to repeal obsolete and rarely used provisions of the Internal Revenue Code of 1954. Section 269(c) was deemed to be such a provision. See H.R.Rep. No. 94-658, 94 Cong., 1st Sess. reprinted in 1976 U.S. Code Cong. & Ad.News 2897, 3274. The legislative history of this repeal suggests rather

strongly that section 269(c) was redundant since it was believed to be embraced in the existing general tax litigation principle that the Commissioner's determination of a tax avoidance motive is presumptively correct and the burden was already on the taxpayer regardless of the existence of section 269(c).

abandonment losses were reported on the tax return each year in a schedule of "other deductions" and identified simply as follows:

| 1960 | "Abandonment losses | — $1,371,862.50" |
| 1964 | "Abandonments | — $ 254,836.52" |

The leases sold at a loss were reported in 1960 on "Schedule D," the schedule required for reporting gain and losses from sales or exchanges of property. This schedule identified the leases sold at a loss in 1960 simply as "Texas Leases" which were foreclosed on by the First National Bank of Lubbock, Texas, resulting in a reported loss of $606,-418.44. Elgin's 1960 schedule D also reported that the leases were acquired in 1956 for $1,238,314.63 and that $242,018.18 had been allowed (or allowable) as depletion and/or depreciation deductions between 1956 and 1960. The gross sales price (the amount of the mortgage indebtedness satisfied by the foreclosure) was reported as $398,878.01.[10]

Elgin's 1964 tax return reported the leases sold at a loss in the schedule of "other deductions." The deduction was identified simply as a "Loss on Sale of Properties . . . $384,130.33." The 1964 tax return produced in evidence did not include a schedule D. The return did not report the information required on a schedule D, such as a description of each property sold or exchanged, the dates the properties were acquired and sold, the sale price received for the properties, the depletion and/or depreciation deductions taken over the period of the ownership of the properties, the expense of selling the properties, and the gain or loss from the sale or exchange of each property.

█ Plaintiff was unable to produce significant documentation to substantiate the losses Elgin reported on its 1960 through 1964 tax returns. The bulk of Elgin's financial records relating to these years were apparently destroyed either by a 1969 fire in the storerooms of plaintiff's accounting

firm, Philip Rootberg & Company, or by the normal and systematic destruction of old files conducted by Touche Ross & Company, the successor to Elgin's 1960 accounting firm, Ballin, Milstein, and Feinstein. There is no indication in the record that Elgin's financial records relating to the losses claimed on its 1960 and 1964 tax returns were destroyed intentionally, fraudulently or in bad faith. Nevertheless, the accidental loss or destruction of records supporting a tax deduction does not alleviate or diminish plaintiff's burden to adequately substantiate the deduction claimed. *Allen v. Commissioner,* 117 F.2d 364, 368 (1st Cir.1941); *Awe v. Commissioner,* 7 T.C.M. (CCH) 519, 522 (1948); *Pennant Cafeteria Co. v. Commissioner,* 5 BTA 293 (1926). The Supreme Court stated this general proposition of tax law in *Burnet v. Houston,* 283 U.S. 223, 228, 51 S.Ct. 413, 415, 75 L.Ed. 991 (1931):

> The impossibility of proving a material fact upon which the right to relief depends, simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof.

█ To substantiate the losses Elgin reported on its 1960 and 1964 tax returns, plaintiff has the burden of proving what Elgin's basis was in each property interest at the time it was sold or abandoned. *See, e.g., Byerlein v. Commissioner,* 13 T.C. 1085 (1949) (abandonment); *Watch Paper Co. v. Commissioner,* 27 BTA 488 (1932) (sale). If the property was sold or exchanged, plaintiff must also establish the amount of the consideration received. *See, e.g., Jacobs v. Commissioner,* 33 T.C.M. (CCH) 379, 389 (1974). If the property was abandoned, plaintiff must prove that the property became worthless in the taxable year involved and that the property was, in fact, abandoned. *See, e.g., A.J. Industries, Inc. v. United States,* 181 Ct.Cl. 1017, 388 F.2d 701

---

10. There appears to have been an arithmetical error in the computation of the loss reported on this schedule. When the reported basis of $1,238,314.63 in these leases is reduced by the depletion/depreciation allowances of $242,- 018.18 and the proceeds from the foreclosure of $398,878.01, the resulting loss is $597,418.44 rather than $606,418.44 as reported in the schedule.

(1967); *Commissioner v. McCarthy,* 129 F.2d 84 (7th Cir.1942); *Enid Ice & Fuel Co. v. United States,* 142 F.Supp. 486 (W.D.Okl. 1956); *Reed's Estate v. Scofield,* 89 F.Supp. 847 (W.D.Tex.1950).

(a) *1960 Losses:* Plaintiff relies primarily [11] on the testimony of Olen L. Ledgerwood (Ledgerwood), the accountant who prepared Elgin's 1960 tax return, to substantiate the basis in each of the properties reported on Elgin's 1960 tax return as sold or abandoned. Ledgerwood testified generally that at the time he prepared Elgin's 1960 tax return, he believed each reported basis to be correct. Ledgerwood's audit of Elgin's books and reports and his preparation of Elgin's 1960 tax return occurred some 20 years prior to his testimony at trial. Ledgerwood understandably could not recall the specific information which his audit of Elgin's books and records had revealed. At trial, Ledgerwood could not identify the leases which Elgin abandoned or sold in 1960. He was unable, understandably, to remember any details concerning the transactions in which the leases were acquired by Elgin or its predecessor corporations.

The only evidence plaintiff presented which identified the properties abandoned and sold in 1960 was an undated summary of Elgin's 1960 losses prepared between 1966 and 1969 by Stanton Derdiger (Derdiger), an accountant with plaintiff's accounting firm, Philip Rootberg & Company. This document states that four of the five leases Elgin abandoned in 1960 were acquired by Randex Consolidated Oil Co. (Randex) in exchange for shares of Randex stock. Derdiger's summary states a value for Randex stock on the dates the properties were acquired. The summary also states Elgin's basis in the Texas leases which were foreclosed upon as well as the proceeds Elgin received from this foreclosure. Derdiger prepared the document in connection with the government's examination of plaintiff's tax returns which led to this litigation. Derdiger did not personally verify the information contained in the document. The information was obtained from Elgin's books and records, the 1960 tax return working papers, and other documents which were not put in evidence, presumably because they had been accidentally lost or destroyed. The reliability of the documents from which Derdiger prepared his summary cannot be determined from the evidence in the record.[12] Derdiger's summary therefore cannot be determined to be reliable, and it is not sufficient evidence of Elgin's basis in the identified leases to substantiate the losses Elgin reported in 1960.[13]

11. In its proposed findings of fact plaintiff relies exclusively on Ledgerwood's testimony, and several documents prepared by Ledgerwood, as substantiation for the losses claimed by Elgin in 1960. However, the record contains other documentary evidence which relates to these losses. This opinion is based on a review of the entire record, not just those portions referred to by plaintiff in its proposed findings of fact.

12. To an undetermined extent, Derdiger relied upon the tax return working papers prepared by Ledgerwood in conjunction with the preparation of Elgin's 1960 tax returns. Since Ledgerwood, in turn, had accumulated this information from books and records prepared by third persons, Derdiger's summary of Elgin's 1960 losses inherits all the unreliability, discussed above, which surrounds these original books and records.

13. Indeed, the limited documentary evidence which is in the record indicates that the number of shares of Randex stock exchanged for three of the leases Elgin abandoned in 1960 is erroneously reported in Derdiger's summary. Derdiger's summary reports that Elgin's carryover basis was established in three of the leases abandoned in 1960 when Randex (Elgin's predecessor corporation) acquired all the assets of American-Caribbean Corporation (American-Caribbean I) on December 16, 1957. However, this transaction between Randex and American-Caribbean I has all the attributes of a tax-free reorganization wherein the basis in the leases owed by American-Caribbean I would carryover to Randex. Therefore, it appears that Elgin's basis in these leases was established when American-Caribbean I acquired the properties from independent parties, not when Randex acquired the properties from American-Caribbean I.

Furthermore, even assuming that Elgin's basis in these leases was established when Randex acquired them from American-Caribbean I, Derdiger's summary of the number of Randex shares given for each property appears to be in error. The total number of Randex shares given for all the assets of American-Caribbean I (1,587,500) are allocated on Derdiger's summa-

Many, if not all, of the leases abandoned or sold in 1960 were acquired by Elgin from three corporations with which Elgin merged on July 14, 1959. Since these mergers qualified as tax-free reorganizations under Internal Revenue Code § 368, Elgin's basis in each of the leases acquired through the mergers ostensibly was carried over from the corporations which owned the leases prior to the merger. Ledgerwood's determination of Elgin's basis in each lease acquired by merger required that he rely, to an undetermined extent, on the books and records of the corporations which were merged into Elgin. These books and records were not presented in evidence. There was no evidence presented at trial which would support a determination that the books and records of Elgin's predecessor corporations were maintained in an orderly, reliable, and accurate manner. Ledgerwood's preparation of Elgin's 1960 tax return could only have been as accurate as the information he relied upon.

It was also necessary for Ledgerwood to rely, again to an undetermined extent, on Elgin's books and records. There is uncontradicted evidence in the record that Elgin's books and records, at the time Ledgerwood prepared the 1960 tax return, were unorganized, and in some aspects, incomplete.[14] Faced with a similar absence of supporting documentation, the Tax Court has held that a taxpayer failed to carry its burden of proving his basis when the only evidence presented was the corporation's books prepared by an accountant from information supplied to him without independent verification. *Coleman v. Commissioner*, 33 T.C.M. (CCH) 411, 413 (1974).

Ledgerwood testified generally that whenever his audit revealed that Elgin or its predecessor corporations had acquired a lease in exchange for stock rather than cash, Elgin's basis in the lease was determined to be the fair market value of the stock exchanged for the lease. For each type of stock exchanged for leases, Ledgerwood's superior, Julian Ballin (Ballin), obtained quotations of bid prices, on or near the date the stock was exchanged for a lease, from Peters, Writer & Christensen (PWC), a stock brokerage firm located in Denver, Colorado. Ledgerwood testified that he determined the fair market value of the various stocks involved by utilizing the low bid price quote supplied by PWC as the fair market value of a single share of the stock and then multiplying this value by the number of shares exchanged for the lease.

There is no evidence in the record indicating the source utilized by PWC to supply Ballin, and ultimately Ledgerwood, with bid price quotations for the stock in question. The dates of the quotes supplied Ballin also cannot be determined from the evidence in the record. Ledgerwood was not a stock broker or an investment analyst. His determination of the value of the stock exchanged for leases relied entirely on quotations supplied by PWC, and is therefore only as reliable as the source used by PWC. Since the reliability of this underlying information cannot be determined, the relia-

---

ry between three of the leases abandoned in 1960. Yet the record clearly indicates that Randex acquired a small amount of cash and 50,000 shares of Cataract stock from American-Caribbean I in this transaction along with these three leases. Derdiger's summary appears to assign absolutely no value to this cash and stock.

Finally, Derdiger's summary appears to overvalue one of the leases acquired from American-Caribbean I and abandoned in 1960. The Bolivian lease was acquired by American-Caribbean I in the same month that Randex acquired all the assets of American-Caribbean I. American-Caribbean I acquired the lease and 50,000 shares of Cataract stock from Cataract in exchange for 350,000 shares of American-Caribbean I stock. Since Randex acquired American-Caribbean I's assets "on the basis of one share of [Randex] for each share of American-Caribbean I" no more than 350,000 shares of Randex stock could have been exchanged for the Bolivian lease. Derdiger's statement in his summary that this lease was acquired for 592,-240 shares of Randex appears to be erroneous.

14. Ledgerwood's accounting firm was engaged in 1961 to prepare Elgin's tax returns for the years 1959 and 1960. Elgin had not filed a tax return since its incorporation on April 30, 1959. Such delinquency appears to be a representative example of the disorganization of Elgin's management and records at the time Ledgerwood prepared the 1960 tax return.

bility of Ledgerwood's stock valuation based on this information has not been established.

Furthermore, even if plaintiff had established the reliability of the bid and asked quotations received from PWC, Ledgerwood's testimony falls short of carrying plaintiff's burden of substantiating Elgin's basis in leases acquired in exchange for stock. Ledgerwood's reliance solely on the bid price of the stock as an indication of fair market value has not been shown to be a proper method of valuing stock. Plaintiff has failed to persuade the court that large blocks of stock, such as were exchanged for the leases in question, may be properly valued on the basis of quoted bid prices for much smaller quantities of the same stock. Moreover, the stock was unregistered stock, *i.e.,* not registered with the United States Securities and Exchange Commission. It is not unreasonable to assume that the value of such stock would be subject to some discount from the public market price. *See Campbell v. United States,* 228 Ct.Cl. 661, 683–88, 661 F.2d 209, 222–24 (1981). The stock used to acquire the bulk of the leases abandoned or sold by Elgin in 1960 was inactively traded on the over-the-counter market. Quotation summaries introduced by defendant for the years in question show relatively few bid and offer quotes for this stock. The bid and offer quotes which are included in these summary sheets show an extreme variation in the price dealers were offering to pay for this stock during the years involved. Under these circumstances, bid and offer quotations are generally considered of "limited probative value" to establish the value of the stocks involved because such quotations do not represent actual transactions but, rather, are in the nature of "feelers." *Fistell v. Christman,* 135 F.Supp. 830, 831 (S.D.N.Y.1955). In *Pandolfo v. United States,* 128 F.2d 917, 921 (10th Cir.1942), the Court of Appeals stated:

It may be conceded, as a general proposition, that a mere quotation of offers to buy or sell is not a proper criterion of value unless it is also shown that a sale results therefrom, or unless the quotation results in a sale in the regular course of business. * * * It may be conceded that the isolated quotations of bids by brokers to buy or sell the stock of the insurance companies involved here are entirely too uncertain, shadowy, and speculative, to form any sound foundation for the determination of value.

Ledgerwood's testimony indicates that he relied exclusively on the quoted bid prices in his valuation of the stock in question without proof that actual sales of the stock had occurred, during the period involved, at values consistent with the values quoted as bid and ask prices. "The fact that quotations are not proof of actual sales becomes extremely significant where the quotations are sporadic and random. In such cases, because of the unreliability of isolated quotations, a court would be remiss in according them much weight." Burns, *Over-the-Counter Market Quotations: Pink, Yellow, Green and White Sheets—A Gray Area in the Law of Evidence,* 52 Corn.L.A. 262, 280 (1967). On the basis of the evidence presented by plaintiff, the trier of fact would be equally remiss in according probative weight to Ledgerwood's valuation of the stock involved since this valuation appears to have been determined solely on the basis of isolated quotations.

Ledgerwood did not clearly articulate the methodology he used to determine Elgin's basis in leases which Elgin or its predecessor corporations acquired in exchange for cash or property other than stock. Without more, Ledgerwood's testimony that the basis of these leases was properly verified at the time he prepared Elgin's 1960 income tax return is not sufficient to carry plaintiff's burden to substantiate the basis of these leases.

Plaintiff also relied exclusively on Ledgerwood's testimony to establish that the leases were actually abandoned or foreclosed upon in 1960. However, Ledgerwood testified that he relied on Elgin's books and records and statements of Elgin's president, Jules Singer (Singer), to determine that the leases had, in fact, been either abandoned or foreclosed upon. Thus, Ledgerwood again relied on information provided him by

third persons who were not subject to examination at trial. Singer was deceased at time of trial. There is no indication that Ledgerwood personally verified the foreclosure and abandonments reported on Elgin's 1960 tax return. Ledgerwood apparently did not even inquire of the lessors of the properties in question to determine if they considered the leases abandoned by Elgin. Since Ledgerwood based his determination that the leases had been abandoned or foreclosed upon on information supplied him by third persons not before the court and without independent verification, his testimony is not sufficient to substantiate the abandonment and § 1231 losses claimed by Elgin in 1960. *See Coleman v. Commissioner, supra,* 33 T.C.M. (CCH) at 413.

Ledgerwood's testimony, in essence, amounts to little more than an unsupported statement that the losses he reported in Elgin's 1960 tax return were correct. As the Tax Court stated in *Halle v. Commissioner,* 7 T.C. 245, 247 (1946):

> This court cannot disturb the Commissioner's determination of deficiencies merely upon testimony by the petitioner [or his accountant] that his returns as filed were correct. To do so would mean that the Commissioner's adjustments would not be presumptively correct where the taxpayer swore to the correctness of his returns.

*See also, Geiger v. Commissioner,* 28 T.C.M. (CCH) 795, 796 (1969) *affirmed,* 440 F.2d 668 (9th Cir.1971), *cert. denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 90 (1971); *Wilkinson v. Commissioner,* 71 T.C. 633 (1979); *Roberts v. Commissioner,* 62 T.C. 834, 837 (1974).

The Tax Court recently addressed a somewhat similar situation in *Conovitz v. Commissioner,* 39 T.C.M. (CCH) 929, 934 (1980). The only evidence presented in substantiation of deductions claimed by the taxpayer and disallowed by the IRS was the testimony of the taxpayer's attorney, who prepared the tax returns in question. The taxpayer's attorney testified that he saw documentation which supported each deduction reported on the tax return in question

at the time he prepared the return. The Tax Court concluded that:

> Such evidence is plainly insufficient to substantiate petitioner's right to the deductions, and is not sufficient to overcome the presumptive correctness of the Commissioner's determination.

The unsupported testimony of plaintiff's accountant, Ledgerwood, that he verified Elgin's basis in the leases sold or abandoned in 1960 is similarly insufficient to overcome the presumption of correctness which accompanies the Commissioner's notice of deficiency.

(b) *1964 Losses:* Plaintiff proposed no findings of fact to substantiate the losses Elgin reported from properties sold or abandoned in 1964. However, plaintiff presented some evidence at trial relating to the 1964 losses, including the testimony of Derdiger, the accountant who prepared Elgin's 1964 tax returns. Derdiger's 1964 tax return working papers and other documents relating to Elgin's 1964 losses were also presented in evidence. It is concluded that the evidence of record is not sufficient to carry plaintiff's burden of substantiating the basis claimed in each of the properties abandoned or sold in 1964.

Derdiger's 1964 tax return working papers identify the properties Elgin abandoned or sold in 1964 and the basis claimed in each property.

Derdiger testified that he determined the reported basis in each of the properties sold or abandoned by referring to the basis reported for these properties on Elgin's books and records for the previous year. Unlike Ledgerwood, Derdiger was unable to recall ever verifying Elgin's basis in these properties by an independent examination of documents involving the transactions in which Elgin or its predecessors acquired the properties. Derdiger could not recall verifying the value assigned to stock used to acquire leases. Derdiger's working papers merely record his conclusions of the amount of Elgin's basis in the properties allegedly abandoned or sold. The papers, without more, are therefore not competent evidence of what Elgin's basis in these properties actually was.

Derdiger, understandably, could not recall what specific information he saw and relied upon which led him to conclude, approximately 17 years prior to trial, that Elgin had sold or abandoned a particular lease in 1964 resulting in a loss to Elgin of a particular amount. Derdiger could only testify that the information he reported on Elgin's 1964 tax return and working papers was supported by some information in Elgin's books and records at the time he prepared the 1964 tax return. The record indicates that Derdiger derived the information reported on Elgin's 1964 tax return and working papers primarily, if not exclusively, from information contained in Elgin's books and records without independent verification. It is precisely this reliance on books and records prepared by third persons, not available for examination, which has led courts to generally hold that the testimony of an accountant regarding the accuracy of the tax return he prepared, without more, "adds nothing" to plaintiff's case.[15] *Geiger v. Commissioner, supra,* 28 T.C.M. (CCH) at 796, *affirmed,* 440 F.2d at 698, *cert. denied,* 404 U.S. at 851, 92 S.Ct. 88, 30 L.Ed.2d 90. *See Coleman v. Commissioner, supra,* 33 T.C.M. (CCH) at 413. *See also, Nager Electric Co. v. United States,* 194 Ct.Cl. 835, 860, 442 F.2d 936, 950 (1971). Since plaintiff has introduced no evidence, other than Derdiger's testimony and work papers, to substantiate the basis Elgin re-

ported in the properties sold or abandoned in 1964, plaintiff has failed to establish that the Commissioner was in error when it denied plaintiff's deduction of these losses based on lack of substantiation.

Derdiger also could not recall exactly what information he relied upon to determine that Elgin had in fact abandoned or sold the properties in question in 1964. His unsupported testimony that the information reported on Elgin's 1964 tax return was, to the best of his knowledge, correct is not sufficient evidence to carry plaintiff's burden of proving that Elgin in fact abandoned or sold the properties claim on the 1964 tax return. *See Geiger v. Commissioner, supra,* 28 T.C.M. (CCH) at 796, *affirmed* 440 F.2d at 688, *cert. denied,* 404 U.S. at 851, 92 S.Ct. 88, 30 L.Ed.2d 90; *Wilkinson v. Commissioner, supra,* 71 T.C. at 633; *Roberts v. Commissioner, supra,* 62 T.C. at 837; *Halle v. Commissioner, supra,* 7 T.C. at 247.

(c) *1961, 1962, and 1963 losses:* As previously indicated, Elgin's net operating losses in 1961, 1962 and 1963 were not caused by the abandonment or sale of leases or other properties. Similarly, a portion of Elgin's net operating loss in 1964 was caused by deductions other than for the abandonment or sale of leases or other properties. Plaintiff introduced no evidence to substantiate these losses other than the tax returns for these years and some working papers.[16] Therefore, plaintiff has not carried its bur-

---

15. There was documentary evidence in the record which indicated that, due to his reliance on Elgin's books and records, Derdiger erroneously reported Elgin's basis in one of the leases abandoned in 1964. Derdiger reported Elgin's basis in the Dunaway lease as $289,540.60, the same basis which Elgin had reported on the lease in its 1960 tax return. The Dunaway lease had previously been acquired in 1956 by American-Caribbean Corporation (American-Caribbean II), one of Elgin's predecessor corporations, which reported the same basis in the Dunaway lease in its 1958 tax return. However, American-Caribbean II sold the Dunaway lease prior to its merger with Elgin in 1959. Elgin acquired an interest in the Dunaway lease for the first time in 1960. Nevertheless, Elgin's 1959 tax return included the Dunaway lease among Elgin's assets and reported the same basis as American-Caribbean had reported in the lease, except for an obvious transpositional typographical error, i.e., $287,540.*06* instead of

$289,540.*60*. Elgin's 1960 tax return continued to report a basis in the Dunaway lease identical to the basis reported by American-Caribbean II in 1958, as though Elgin had acquired the lease with a carry-over basis from American-Caribbean II when the two corporations merged in 1959. The basis reported in Elgin's 1960 tax return thus appears to be in error. Derdiger's reliance on Elgin's books and records caused him to incorporate this error in Elgin's 1964 tax return.

16. The record does not indicate who prepared Elgin's 1961 tax return and the working papers relating to this return were not in evidence. The accounting firm of Birrell, Zimmerman & Thomas in Salt Lake City, Utah, prepared Elgin's 1962 and 1963 tax returns. The working papers prepared by this firm were in evidence, but no member of the firm testified at trial.

den of substantiating these losses. *See Coleman v. Commissioner, supra,* 33 T.C.M. (CCH) at 413. In disposing of these particular claims, *supra,* it has been assumed that none are the subject of settlement mentioned previously. *See* note 1, *supra.*

Accordingly, even if one were to conclude, contrary to the determination reached in part I B (2), *supra,* that plaintiff acquired control of Elgin for the principal purpose of evading or avoiding Federal income taxes, plaintiff has failed to substantiate any of the losses which underscore the claims here under consideration.

## II.

### *The 1966 Partnership Distribution*

The second issue litigated by the parties involved the characterization of a distribution of money plaintiff's wholly-owned subsidiary, Outer Drive East Corporation (hereinafter referred to as either ODE or plaintiff), received in 1966 from Randolph Outer Drive Venture (Venture), a limited partnership in which plaintiff was a general partner. Plaintiff received the distribution shortly after the Venture was reorganized to admit two new limited partners who contributed the money subsequently distributed to plaintiff. The IRS taxed this distribution as the proceeds of a sale of a portion of plaintiff's partnership interest under IRC section 741.[17] Plaintiff, on the other hand, first stresses that section 721(a) provides, in essence, that upon the admission of new partners to a partnership, the existing partners will not recognize gain or loss for a contribution of property to the partnership in exchange for an interest in the partnership and then contends that the amount it received as a partner from the contribution to capital by the new limited partners to the partnership was a distribution of money by a partnership to a partner on which no gain is recognized under section 731(a), unless the amount distributed exceeds the partner's adjusted basis in his partnership interest. It is conceded that the amount

distributed did not exceed the partner's adjusted basis in the partnership. The issues as framed by the briefs of the parties are whether there was a sale of a partnership interest and/or whether Treasury Regulation Section 1.731–1(c)3 is applicable to the facts of this case.

As indicated previously, the decision of the Commissioner on this issue is endowed with a presumption of correctness which plaintiff has the burden to overcome. *See Welsh v. Helvering, supra,* 290 U.S. at 115, 54 S.Ct. at 9; *Montgomery Coca-Cola Bottling Co. v. United States, supra,* 222 Ct.Cl. at 366, 615 F.2d at 1322; *KFOX, Inc. v. United States, supra,* 206 Ct.Cl. at 151, 510 F.2d at 1369. After careful consideration of all the evidence, as discussed below, it is determined that plaintiff has successfully carried its burden of overcoming the Commissioner's presumption of correctness and has proved persuasively that the money it received from the Venture in 1966 was a bona fide distribution from the partnership which should not be taxed as the proceeds from a sale of a partnership interest. The Commissioner in reaching his determination did not have the benefit of a trial record on which to predicate his conclusion—a record which serves to rebut the presumption that would otherwise carry the day for him.

### (1) *Admission of New Limited Partners*

The Venture was formed in 1962 to build a high-rise building containing 940 apartments, office and commercial spaces, a health club, 3 restaurants, a grocery store, and a parking garage (hereinafter referred to as the Project) on certain air rights which plaintiff had previously acquired over railroad yards on lakefront property in Chicago owned by the Illinois Central Railroad (IC). Plaintiff, through its wholly-owned subsidiary, ODE, owned a 77.5 percent general partnership interest in the Venture and was the Venture's only general partner. Empire Properties (Empire) owned the entire remaining 22.5 percent interest in the Venture as a limited partner. Empire was

---

17. *Section 741 provides that any gain or loss shall be recognized to the transferor partner in the event of a sale or exchange of his interest in* the partnership. Such a transaction is viewed as a sale or exchange of a capital asset and is so taxed.

itself a limited partnership composed of members of a wealthy Chicago family which was active in real estate investments.

To finance the construction of the Project, the Venture obtained a $20,000,000 mortgage loan from a group of commercial banks. This loan was guarantied by the Federal Housing Administration (FHA). Under the partnership agreement between plaintiff and Empire, plaintiff was obligated to supply all monies, in excess of the mortgage loan, needed to complete construction of the Project. Pursuant to this obligation, plaintiff loaned the Venture approximately $4,000,000, interest free, before construction of the Project was completed in 1964.

In 1965, the Venture began actively searching for investors interested in joining the Venture as limited partners. The Venture planned to use the amounts invested by new limited partners to repay the amounts it owed plaintiff. In the fall of 1965, plaintiff began negotiations with members of the Wilkow family, organizers of a Chicago based group of real estate investors, leading to the admittance of two limited partnerships formed by the Wilkow family into the Venture as limited partners.[18] These two limited partnerships will be referred to collectively in this opinion as the Wilkow Group. The Wilkow Group was composed primarily of first and second generation elderly immigrants with relatively small individual amounts of money to invest. Most members of the Wilkow Group relied upon the income from their investments to supply them with daily needs. Therefore, these members required monthly or quarterly distributions of income from their investments. Since the principal invested often represented the entire savings of each member, the Wilkow Group only participated in investments which provided great security of principal and a secure, constant rate of return.

Plaintiff and the Wilkow Group approached the negotiations with the understanding that only a limited partnership interest would satisfy both the Wilkow Group's security needs and the plaintiff's objective to maintain management control of the Venture's operation. The Wilkow Group believed a general partnership interest involved too much risk. Plaintiff was seeking additional partners only as a means of raising capital; it did not want to give up any control of management to additional general partners.

Initial negotiations revealed that the Wilkow Group was willing to invest $4,650,000, if sufficiently secured, in exchange for a constant annual return rate of 8 percent. Subsequent negotiations established the characterization of this total investment. The Wilkow Group contributed $1,150,000 to the Venture's capital and loaned the Venture $3,500,000 at an interest rate of 4 percent. The loan amount calculated to replace plaintiff's loan to the Venture, which had been reduced to approximately $3,431,000 as of May 31, 1966, the date the Wilkow Group was admitted to the Venture.

The Venture was reorganized to admit the Wilkow Group as limited partners, with a total partnership interest of 20 percent, by the execution of an amended partnership agreement. This amended agreement provided the Wilkow Group with a secure rate of return equal to 8 percent on its total investment in the Venture. The amended agreement required the Venture to make the monthly payments of interest and principal on the Wilkow loan before making any distributions of partnership income to other partners. In a separate document, plaintiff and Empire pledged their respective partnership interests to the Wilkow Group as security for the loan. In addition, the amended agreement gave the Wilkow Group a cumulative right to monthly payments out of partnership income which was also given priority over distributions of partnership income to other partners. The agreement provided that these cumulative

---

**18.** The two limited partnerships were Outer Drive East Associates which had a 1.33 percent limited partnership interest in the Venture and Robert Wilkow Associates, which had an 18.67 percent limited partnership interest.

monthly distributions would increase every 6 months so that the Wilkow Group's combined rate of return on the 4 percent loan and the contribution to capital would remain at 8 percent of the total amount originally invested as the repayment of loan principal decreased the amount of monthly interest the Wilkow Group received. These rights and preferences made the Wilkow Group's limited partnership interest unique from any partnership interest existing prior to the execution of the amended partnership agreement.

The original partnership agreement between plaintiff and Empire required the consent of both partners before any new partners could be admitted to the Venture. Plaintiff initially planned to proportionately reduce its interest and Empire's interest in the Venture by 20 percent to allow the admission of the Wilkow Group to the Venture as limited partners with a 20 percent partnership interest. However, Empire refused to consent to the admission of the Wilkow Group if the result was a reduction in Empire's proportioned partnership interest. The parties therefore structured the reorganization of the Venture so that plaintiff's partnership interest was decreased from 77.5 percent to 57.5 percent upon the admission of the Wilkow Group. Empire's partnership interest remained at 22.5 percent before and after the partnership reorganization.

Plaintiff was required to make other concessions to Empire to obtain its consent to the admission of the Wilkow Group to the Venture. The amended partnership agreement relieved Empire of any obligation to contribute the capital necessary to meet the monthly payments to the Wilkow Group in the event partnership income was insufficient. Plaintiff was required to loan Empire $500,000 which was to be repaid solely out of Empire's proceeds from the Venture.[19] This loan was, in effect, a prepayment of Empire's anticipated future distributions from the Venture. As a final in-

ducement to Empire, plaintiff granted Empire the right to participate in any future development of air rights adjacent to the Project.

The Venture shortly distributed to plaintiff and Empire the total amount the Wilkow Group contributed and loaned to the partnership. Plaintiff received $3,431,000 as a repayment of its outstanding loan to the Venture. The remainder of the loan and the entire $1,150,000 contributed to capital were distributed to Empire and plaintiff in proportion to their pre-reorganization partnership interests. Empire paid to plaintiff the entire amount it received in this regard, approximately $258,000, as a partial repayment of the $500,000 loan which plaintiff made to induce Empire's consent. The Commissioner has not challenged the authenticity of the Wilkow Group's loan to the Venture or the Venture's use of the money to repay plaintiff for plaintiff's outstanding loan to the Venture. In its deficiency notice, the Commissioner treated the admission of the Wilkow Group as a purchase and sale of 20 percent of plaintiff's partnership interest in exchange for cash in the amount of $1,150,000 (the Wilkow Group's contribution to capital) plus a reduction in plaintiff's liability in the amount of $3,847,124 (the Wilkow Group's assumption of 20 percent of the Venture's mortgage liability).

### (2) Form and Substance of The Transaction

It has been noted that partnerships are "special animals" in the IRC. Code provisions "give partners great latitude in selecting the form the partnership takes and how economic benefits and burdens are allocated among the partners." *Hamilton v. United States*, 687 F.2d 408, 412–413 (Ct.Cl.1982). Indeed a principal objective of the partnership provision of the tax code "was to afford the parties 'flexibility' in allocating the tax burden of partnership transactions among themselves." McKee, Nelson & Whitmere, *Federal Taxation of Partner-*

---

**19.** The validity of this loan was challenged by the Commissioner and upheld by the Tax Court

in *Falkoff v. Commissioner*, 62 T.C. 200 (1974).

*ships and Partners* ¶ 1.03 (1977), citing, H.R. Rep. No. 1337, 83d Cong., 2d Sess. 65 (1954). *See also* 1 A. Willis, *Partnership Taxation,* § 14.08 (2d ed. 1976). The courts have generally recognized this legislative objective. For example, the Tax Court in *Foxman v. Commissioner,* 41 T.C. 535, 551 (1964) observed:

> One of the underlying philosophic objectives of the 1954 Code was to permit the partners themselves to determine their tax burdens *inter sese* to a certain extent, and this is what the committee reports meant when they referred to 'flexibility.'

The partnership provisions of the tax code achieve this flexibility by, *inter alia,* allowing a partner to choose either to sell his partnership interest to a third person or to reorganize the partnership to allow the admission of the third person as a new partner.

█ The major limitation on this flexibility has been expressed by the court in *Miller v. United States,* 181 Ct.Cl. 331, 344 n. 3 (1967) as follows: "Of course, the true nature of the transaction and the intent of the parties must be ascertained. If a 'sale' is a sham it will be disregarded and a true sale is not made a liquidation by mere words." The parties must have intended to transfer the partnership interest in the form in which the transaction is cast. The legislative policy of flexibility does not permit a taxpayer to avoid the tax ramifications of a sale of a partnership interest simply by casting the intended sale in the form of a reorganization of the partnership. The form of the transaction must comport with the intentions of the parties. *See Communications Satellite Corp. v. United States,* 223 Ct.Cl. 253, 625 F.2d 997 (1980); *Crenshaw v. United States,* 450 F.2d 472 (5th Cir.1971); *Otey v. Commissioner,* 70 T.C. 312 (1978), *affirmed,* 634 F.2d 1046 (6th Cir.1980). In this case it is concluded that the form of the transaction was in keeping with its substance, and the intent of the parties.[20]

█ The essential distinction between characterizing the transaction in the present case as either a sale of plaintiff's partnership interest or a contribution to the Venture followed by a distribution of capital to plaintiff is found in the intent of plaintiff, Empire, and the Wilkow Group. This determination of the parties' intent is a question of fact which is often difficult to resolve. One commentator has made note of the difficulty surrounding this area of the law of partnership taxation. *See* Rubinstein, *Transfers of Property to a Partnership: Contributions or Sales and Related Uncertainties,* 34 Tax Lawyer 371, 373 (1981).

In this case, the intent of the parties plays a crucial role in reaching a determination on the matter in issue. *See Miller v. United States, supra,* 181 Ct.Cl. at 341. The intent of plaintiff, Empire, and the Wilkow Group, as determined from an examination of the treatment of the transaction in the documents and the other surrounding circumstances was unquestionably to reorganize the Venture and admit the Wilkow Group as new limited partners, rather than to sell a portion of plaintiff's general partnership interest. The testimony, which is deemed credible, of all parties involved clearly supports this finding. This well established intent serves to carry the day for plaintiff. *See Otey v. Commissioner,* 70 T.C. 312 (1978), *affirmed,* 634 F.2d 1046, 1047–48 (6th Cir.1980); *see also Park Realty Co. v. Commissioner,* 77 T.C. 412 (1981). The parties did not choose the form of this transaction because it had better tax ramifications than an outright sale of plaintiff's partnership interest. The uncontradicted evidence in the record establishes that plaintiff would not have considered a sale, and the Wilkow Group would not have con-

---

20. The Agreement for Admittance of Limited Partners to Limited Partnership contains the word "purchase" with reference to the acquired interest, but also contains the words, with reference to the cash payment by the Wilkow group to the partnership, "contribution to capital." These contractual formalisms and party emphasis thereon are not deemed relevant in this case. *See Xerox Corp. v. United States,* 228 Ct.Cl. 406, 411, 656 F.2d 659, 662 n. 2 (1981).

sidered a purchase, of a portion of plaintiff's general partnership interest. The economic and legal pre-requisites of plaintiff and the Wilkow Group mandated that the partnership be reorganized to admit the Wilkow Group as new limited partners.

The Wilkow Group's limited partnership interest did not exist prior to the reorganization of the Venture. This newly-created limited partnership interest gave the Wilkow Group cumulative rights to monthly distributions of income which had priority over all distributions to plaintiff and Empire. Neither plaintiff nor Empire owned such a cumulative priority right to the Venture's income prior to the reorganization. The Wilkow Group's limited partnership interest created by the reorganization carried no obligation to advance money needed by the Venture beyond the initial capital contribution and loan. Plaintiff's and Empire's partnership interests imposed such an obligation, to varying extents, both before and after the reorganization. Since the Wilkow Group's limited partnership interest was unique from the partnership interests owned by plaintiff and Empire, the Wilkow Group could not have purchased this interest directly from either partner.

Although plaintiff's general partnership interest was decreased from 77.5 percent to 57.5 percent after the reorganization, plaintiff remained in a more favorable position after the reorganization than it would have been if it had directly sold a 20 percent general partnership interest to the Wilkow Group. Both before and after the reorganization, plaintiff remained the sole general partner with 100 percent control of the management of the Venture. Plaintiff did not want to share its management responsibilities with any other partner. Furthermore, the Wilkow Group was not interested in acquiring a share of the management responsibilities. The parties could not have accomplished these goals by a direct purchase and sale of a portion of plaintiff's general partnership interest.

A further indication that this transaction was intended, and could only have been accomplished, as a reorganization of the Venture is found in a change which the amended partnership agreement made in the rights and obligations of plaintiff and Empire vis-a-vis each other. Prior to the reorganization, plaintiff and Empire were both obligated to advance all amounts which the Venture required. After the reorganization, the amended partnership agreement expressly removed Empire's obligation to advance amounts which the Venture needed to make the monthly payments to the Wilkow Group. Of course, no change in the rights between plaintiff and Empire could have been accomplished solely by a direct sale of a portion of plaintiff's general partnership interest to the Wilkow Group.

The Wilkow Group's contribution to the Venture's capital was not treated as the proceeds of a sale of a portion of plaintiff's partnership interest. The amount was distributed to plaintiff and Empire according to their respective pre-reorganization partnership interests—77.5 percent to plaintiff and 22.5 percent to Empire. If plaintiff's intent was to sell a portion of its partnership interest to the Wilkow Group, it should have received 100 percent of the "purchase price" the Wilkow Group paid for the interest. The Commissioner's deficiency notice treats Empire's 22.5 percent portion of the Wilkow Group's capital contribution as having actually been received by plaintiff and subsequently paid over to Empire as an "expense of sale." The government's theory is that plaintiff was required to pay Empire 22.5 percent of the proceeds from the sale of the general partnership interest in exchange for Empire's consent to the transaction. There is no evidence in the record which even suggests that plaintiff received 100 percent of the Wilkow Group's contribution to capital and subsequently paid Empire a portion of these proceeds for its consent. Rather, the evidence establishes that the amounts contributed to capital was treated as partnership property and was distributed according to the provisions of the partnership agreement—77.5 percent to plaintiff and 22.5 percent to Empire.

The transaction involved in this case was not "a camouflaged sale of a partnership

interest." *Cf. Crenshaw v. United States,* 450 F.2d 472, 476 (5th Cir.1971). The parties had legitimate business reasons for structuring the transaction as they did. In fact, the goals sought by the parties could not have been achieved by structuring the transaction as a sale of a portion of plaintiff's partnership interest. Plaintiff has carried its burden of proving that the transaction in issue was not a sale of its partnership interest. Plaintiff's proportionate share of the Wilkow Group's capital contribution was received as a distribution of partnership property, rather than the proceeds of a sale as alleged by the Commissioner.

Section 731 provides the normal tax treatment of distributions from a partnership to a partner. Under this provision, the partner does not recognize gain when property (other than money) is distributed and does not recognize gain when money is distributed unless and only to the extent that the value of the money exceeds the partner's adjusted basis in his partnership interest. The statute contains two exceptions to the general rule of nonrecognition which arise when one of the following sections applies: section 736 (relating to payments to a retiring partner or deceased partner's successor in interest) or section 751 (relating to unrealized receivable and inventory items). The government does not contend that section 736 applies to the transaction in issue. Plaintiff admits that section 751 applies to require recognition of a small portion of the distribution, but plaintiff contends that section 731 operates to preclude any additional recognition of the gain it received from the distribution of the Wilkow Group's capital contribution.

### (3) *Treasury Regulation § 1.731–1(c)(3)*

The government contends, as an alternative to its argument that the transaction in question was a camouflaged sale, that section 731 does not provide nonrecognition treatment to the distribution received by plaintiff because the parties wrongfully utilized the partnership entity to effect an exchange of property between them. In support of this claim, the government points to Treasury Regulation § 1.731–1(c)(3), which reads, in pertinent part, as follows:

If there is a contribution of property to a partnership and within a short period:

\* \* \* \* \* \*

(ii) After such contribution the contributed property is distributed to another partner,

such distribution may not fall within the scope of section 731. Section 731 does not apply to a distribution of property, if, in fact, the distribution was made in order to effect an exchange of property between two or more of the partners or between the partnership and a partner. Such a transaction shall be treated as an exchange of property.

This regulation provides an exception to section 731 only when the parties to a transaction, in fact, intended "to effect an exchange of property between two or more of the parties." Since it has already been determined that the plaintiff and the Wilkow Group neither intended a sale (or an exchange) of plaintiff's general partnership interest, nor, in fact, effected an exchange of such an interest, the government's reliance on this regulation to prevent the normal application of section 731 is misplaced.[21]

---

21. In its post-trial submissions, plaintiff argues at length that Treasury Regulation § 1.731–1(c)(3) applies only to exchanges of property other than money for similar non-cash property, and it therefore is not applicable in the present case where plaintiff allegedly exchanged property for money. In support of this argument, plaintiff correctly points out that section 741 and the regulation thereunder frequently prescribe different tax treatment for distribution of property other than money than for distributions of money. This regulation

was designed to prevent potential abuses of the partnership contribution and distribution provisions which may occur as readily in exchanges of appreciated property solely for other appreciated property. Both this court and the Tax Court have recognized that this regulation may apply to exchanges of property for money, although on the facts of each case the regulation was not applied. *See Communications Satellite Corp. v. United States,* 223 Ct.Cl. 253, 625 F.2d 997 (1980); *Otey v. Commissioner,* 70 T.C. 312 (1978), *affirmed,* 634 F.2d 1046 (6th Cir.

**82**

This court reached the same conclusion in *Communications Satellite Corp. v. United States, supra.* In that case, the court held that distributions to partners of amounts new partners paid for admission to the partnership were not proceeds from the sales of partnership interests. The court expressly rejected the government's contention that Treasury Regulation § 1.731–1(c)(3) removed the distributions from the normal nonrecognition treatment of section 731:

> This regulation does not automatically or necessarily require recognition of gain in every situation in which property contributed to a partnership is shortly thereafter distributed to one or more of the partners. The regulation states only that such distributions "may" not be within the scope of section 731. In applying the regulation, substance controls over form (see Treas.Reg. § 1.707–1(a) (1956)). To determine the substance of the transactions, we consider all of their aspects that shed any light upon their true character.

223 Ct.Cl. at 260, 625 F.2d at 1000. The court found sufficient evidence that the parties did not intend the substance of the transactions to be an exchange of partnership interests between established and incoming partners and therefore held that the regulation did not apply to prevent the normal section 731 nonrecognition treatment of the distributions to the established partners.

In the present case, as has previously been discussed, there is sufficient evidence that a sale or exchange of plaintiff's partnership interest for the Wilkow Group's cash was neither intended nor, in fact, effectuated. The regulation therefore does not apply. While the factual setting in *Communications Satellite Corp. v. United States, supra,* is different than that present in this case, a matter which defendant stresses, the thrust of the holding of that case is equally applicable here. In that case, as here, the facts supported a finding that the transactions in question did not constitute sales of a partnership interest

1980). See also McKee, Nelson & Whitmere, *Federal Taxation of Partnerships and Partners,*

and thus were outside the pale of Treasury Regulation § 1.731–1(c)(3).

■ The plaintiff's distribution of its proportionate share of the Wilkow Group's capital contribution should be taxed according to section 731 which provides nonrecognition treatment for the gain received which does not exceed plaintiff's basis in its partnership interest and which does not decrease plaintiff's interest in the Venture's "section 751 property." Such a holding gives due consideration to the intent of all parties to the transactions in question and to the flexibility underscoring the philosophic objectives of the partnership provisions of the IRC.

### CONCLUSION OF LAW

In light of the findings and opinion, it is concluded that plaintiff is not entitled to recover on its claim regarding the deduction of Elgin's net operating losses; but plaintiff is entitled to recover a refund of taxes paid, together with interest thereon as provided by law, arising from the erroneous characterization by the IRS of the partnership distributions plaintiff received in 1966. It is therefore ordered that judgment be so entered, with the determination of the exact amount of recovery to be made in further proceedings unless resolved by the parties administratively or otherwise.

¶ 1302[3]. Thus, it is concluded that plaintiff's argument in this regard is not well-founded.