WALTER K. OEHLSCHLAGER AND MARGARET E. OEHLSCHLAGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Oehlschlager v. Commissioner
Docket No. 43920-86.
United States Tax Court
T.C. Memo 1988-210; 1988 Tax Ct. Memo LEXIS 238; 55 T.C.M. (CCH) 839; T.C.M. (RIA) 88210; May 11, 1988; As amended May 16, 1988; As amended May 23, 1988 Thomas E. Redding and Alan L. Tinsley, for the petitioners. Kermit O. Keeling,Arturo Estrada and Janice R. Kluth for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: This case is before us on petitioner's motion to dismiss for lack of jurisdiction. Respondent determined a deficiency in Federal income tax and additions to tax for 1982. The issue this Court must decide is whether the partnership audit and *240 litigation provisions, section 6221 [1] et seq., apply to the adjustments to petitioners' partnership items from Pyrolytic Research Ltd., a Texas limited partnership. The resolution of this issue is determined by the date the partnership's 1982 taxable year commenced. FINDINGS OF FACT Some of the facts of this case have been stipulated and are so found. Petitioners were husband and wife during 1982 and resided in Katy, Texas, on the date the petition was filed. On December 28, 1981, eight individuals, not including petitioners, formed Pyrolytic Research Associates ("PRA") for the purpose of developing a new commercially feasible process for conversion of organic and other carbon-based material into energy. PRA was carrying on business for profit within the meaning of section 183. The partners' aggregate contributions to PRA were $ 305,000.00. On December 28, 1981, PRA retained Houston Industrial Systems, Inc. ("HIS") to research and develop PRA's technology for a total contract price of $ 300,000. To fulfill its obligation, PRA paid *241 to HIS $ 24,500 in cash and executed a full recourse promissory note in the principal amount of $ 275,000. On December 17, 1982, the eight partners of PRA reorganized PRA into Pyrolytic Research, Ltd. ("PRL"). Ken Looney, one of the eight PRA partners, became the general partner of PRL while the other seven partners became limited partners. All partners remained liable on the note to HIS. PRL's anticipated technology was not fully developed by the end of 1982, and new partners were needed to help fund the development of the technology. Because of this need, PRL reorganized again on December 21, 1982. In PRL's reorganization, the general partner, Ken Looney, became a limited partner and Ken Looney, Inc., became the general partner. Mr. Looney and the limited partners of PRL prior to this second reorganization became Class A limited partners of PRL after the reorganization. Subsequent to the reorganization, twenty-seven new limited partners, including petitioner Walter K. Oehlschlager, were admitted to PRL as Class B limited partners. The Class B limited partners initially contributed an aggregate amount of $ 600,000 cash in exchange for their interests in the partnership. *242 One of the purposes of the admission of the Class B partners was to pay the partnership debt on which the Class A partners were liable. On December 30, 1982, after admission of the Class B partners, PRL paid its $ 275,500 note. The Class A partners' liability for payment was thus extinguished. The Class B partners made an additional capital contribution in 1983. The Class A partners shortly thereafter were repaid their original capital contributions. Prior to the admission of the 27 Class B limited partners, the Class A partners owned 100 percent of the profits and capital of PRL. After the December 21, 1982, reorganization, the Class B partners held the majority interest in the capital and profits of PRL. [2]
*243 On December 30, 1982, PRL entered into a second research and development agreement with HIS for the price of $ 2,042,500. To pay its obligation to HIS, PRL executed on that date two promissory notes in the amounts of $ 1,805,000 and $ 585,000. The Class B partners assumed proportionately the $ 1,805,000 note. The Class A partners did not assume any partnership debt in 1982 and made no additional capital contributions during 1982 or subsequently. PRL filed a partnership return of income for the calendar year 1982 beginning January 1, 1982, and ending December 31, 1982. PRL did not file a separate return for a tax year beginning December 21, 1982. Petitioners deducted on their 1982 Federal income tax return an ordinary loss of $ 125,369 as their allocable share of partnership losses. Respondent disallowed the deduction and issued a deficiency notice to petitioners. OPINION This case is before us on petitioners' motion to dismiss for lack of jurisdiction. Petitioners contend that (i) PRL technically terminated on December 21, 1982, pursuant to section 708(b)(1)(B) when the 27 Class B partners were admitted to the partnership, (ii) pursuant to section 706(c)(1), a new partnership *244 tax year began on that date, and (iii) because the new partnership year began after September 3, 1982, the partnership audit and litigation procedure of 6221 et seq. apply. Accordingly, petitioners argue this Court is without jurisdiction because respondent improperly issued a notice of deficiency rather than a final partnership administrative adjustment ("FPAA"). If petitioners are correct that PRL began a new partnership taxable year on December 21, 1982, then the partnership audit and litigation procedures are applicable. Maxwell v. Commissioner,87 T.C. 783 (1986). If, however, PRL did not commence a taxable year on December 21, 1982, then PRL's taxable year that gave rise to the items reported by petitioner commenced prior to September 4, 1982, respondent properly issued his notice of deficiency, and we have jurisdiction to decide the correctness of the deficiency at issue. Therefore, we must determine whether PRL began a new taxable year on December 21, 1982. [3]
Petitioners direct our attention to sections *245 708(b)(1)(B) and 706(c)(1). Section 708(b)(1)(B) states: a partnership shall be considered as terminated only if * * * (B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits. If we find that this section applies to the reorganization of PRL on December 21, 1982, section 706(c)(1) requires that the partnership close its tax year and begin a new tax year. Section 708(b)(1)(B) requires an analysis of whether the admission of the Class B partners constitutes a sale or exchange of Class A partners' interest in PRL. Generally, as petitioners acknowledge, the transfer of cash or property to a partnership in exchange for an interest of more than 50 percent of the capital and profits of the partnership is not a sale or exchange of partnership interests within the meaning of section 708(b)(1)(B). Section 1.708-1(b)(1)(ii), Income Tax Regs. Normally, such a transfer is regarded as a contribution to capital. Section 721. Petitioners argue that this case is an exception to normal characterization, relying on the deemed exchange rule of the regulations promulgated to interpret section 731. See also section *246 1.721-1(a), Income Tax Regs.Section 1.731-1(c)(3), Income Tax Regs., provides as follows: (3) If there is a contribution of property to a partnership and within a short period: * * * (ii) After such contribution to the contributed property is distributed to another partner, such distribution may not fall within the scope of section 731. Section 731 does not apply to a distribution of property, if, in fact, the distribution was made in order to effect an exchange of property between two or more of the partners or between the partnership and a partner. Such a transaction shall be treated as an exchange of property. Pointing to the payment of PRL's $ 275,500 note and the return of the Class A partners' original capital contributions out of the Class B partners' cash contributions to PRL, petitioners contend that the arrangement effected an exchange of Class A partners' interests for purposes of section 708(b)(1)(B) pursuant to section 1.731-1(c)(3), Income Tax Regs. We disagree with petitioners' analysis. While it is sometimes difficult to discern the distinction between a sale or exchange of partnership interests and a change in ownershhip percentages resulting either from *247 the admission of new partners or from the shifting of percentage interests among existing partners, one key factor in making the distinction is whether the property or cash transferred to obtain an increased partnership percentage in substance becomes a partnership asset. The purpose of section 1.731-1(c)(3), Income Tax Regs., is to preserve the reality of the distinction between exchanges and mere shifts in interests by precluding partners from denominating a sale or exchange of their interests as a contribution of property followed by a distribution to the selling partner. See also section 1.721-1(a), Income Tax Regs. If the partnership has only a fleeting interest in the contributed asset that is distributed to a partner resulting in a diminished partnership interest, the transaction in substance seems to be an exchange of the partnership interest for the property received in distribution. The regulation does not, of course, require that every partnership distribution following a contribution of property be treated as an exchange. The regulation balances the desirability of preserving the tax consequences chosen by the partners with the need to assure that the correct tax consequences *248 indeed flow from the transaction that occurred. Exchange treatment is required if the partners intended "to effect an exchange of property between two or more of the partners or between the partnership and a partner." Section 1.731-1(c)(3), Income Tax Regs.; cf. Otey v. Commissioner,70 T.C. 312 (1978), affd. per curiam 634 F.2d 1046 (6th Cir. 1980). Such a determination is inherently factual and, consequently, is not easily susceptible of sure and fast resolution. Nevertheless, especially if the partners are arguing against the form of the transaction they chose, the Court must discern the intentions of the partners from objective factual implications rather than from an arithmetically applied deemed sale rule. See Communications Satellite Corp. v. United States,233 Ct. Cl. 253, 260, 625 F.2d 997 (1980); Jupiter Corp. v. United States,2 Cl. Ct. 58, 81 (1983). Petitioners here argue against the form of the transaction effecting their transfer to PRL. The partners, however, are presumed to have chosen the form of their transaction seriously and with due regard to the tax consequences that flow from that choice. *249 Barenholtz v. Commissioner,77 T.C. 85, 90-91 (1981). Because the tax consequences of a sale or exchange of a partnership interest and a contribution to capital/partnership distribution may vary considerably, petitioners must adduce strong proof that they intended a transaction different from their chosen form. Coleman v. Commissioner,87 T.C. 178, 201-203 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). Not only have petitioners not adduced strong proof, but the facts suggest that the partners intended petitioners' transfer to PRL to be treated as a contribution to capital. First, the partners treated this transaction for Federal income tax purposes as a contribution of capital independent of the distributions to the Class A limited partners. Had they treated the transaction as a sale or exchange, the partners would have regarded the partnership as terminated on December 21, 1982, and would have filed a final partnership return for the taxable year ending on that date. The new PRL would have filed a partnership return for the year beginning December 21, 1982. Instead, consistently with viewing the transfers as *250 contributions, PRL filed one partnership return of income which embraced the entire 1982 calendar year. Another important indication that the admission of the Class B limited partners was not intended to be a sale or exchange is that all of the original partners retained some capital and profits interest in PRL. Although their interest was reduced below 50 percent by the admission of the Class B limited partners, the shift in ownership percentages reflected in major part the larger financial resources of PRL after the Class B partners' transfer of cash. Furthermore, although debt for which Class A partners were personally liable was retired by Class B partners' contributions, the debt was partnership debt. While Class A partners were deemed to receive distributions on the debt's retirement pursuant to section 752(b), the deemed distribution requirement serves to adjust the basis of a partnership interest and not necessarily to substitute for an actual receipt of partnership property for purposes of the deemed exchange rule of the regulations. Consequently, we hold that the parties to the transaction admitting the Class B partners to PRL intended and effected a contribution *251 to capital followed by a distribution rather than a sale or exchange of partnership interest. Section 708(b)(1)(B) is inapplicable to this case, and thus PRL was not terminated when the Class B partners were admitted into the partnership. The partnership's 1982 tax year began before September 3, 1982, and therefore the partnership audit and litigation procedures are not applicable to it. Maxwell v. Commissioner, supra.Accordingly, we hold that respondent validly issued the notice of deficiency to petitioners, and we have jurisdiction over this matter. Petitioners' motion to dismiss will be denied.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect for the year in issue, unless otherwise indicated. ↩
2. The PRL partnership agreement of December 21, 1982, provides in pertinent part as follows: 4. Gains, Losses, Other Compensation and Distributions
4.1 Allocation of Losses. All items of Partnership loss and deduction shall be allocated to the Classes as follows: (A) From the Effective date of this Agreement until the Class "B" Partners have received cash distributions from the Partnership aggregating Eight Hundred Thousand Dollars ($ 800,000): (i)
General Partner:
0%
(ii)
Class "A" Partners:
0%
(iii)
Class "B" Partners:
100%
(iv)
Class "C" Partners:
0%
(B) Thereafter: (i)
General Partner:
9%
(ii)
Class "A" Partners:
40%
(iii)
Class "B" Partners:
51%
(iv)
Class "C" Partners:
0%
4.2 Allocation of Gains. All items of Partnership income, gain and credit shall be allocated to the Classes in accordance with their "Class Sharing Ratios", which shall be as follows: (A) From the Effective Date of this Agreement until December 31, 1982 (i)
General Partner
0%
(ii)
Class "A" Partners:
10%
(iii)
Class "B" Partners:
90%
(iv)
Class "C" Partners:
0%
(B) Thereafter until December 31, 1987: (i)
General Partner:
0%
(ii)
Class "A" Partners:
40%
(iii)
Class "B" Partners:
60%
(iv)
Class "C" Partners:
0%
(C) Thereafter until the Capital Account of the Class "B" Partners as an aggregate equals fifty-one fortieths (51/40) of the total amount of the Capital Accounts of the Class "A" Partners: (i)
General Partner:
0%
(ii)
Class "A" Partners:
0%
(iii)
Class "B" Partners:
100%
(iv)
Class "C" Partners:
0%
(D) Thereafter: ↩
(i)
General Partner:
9%
(ii)
Class "A" Partners:
40%
(iii)
Class "B" Partners:
51%
(iv)
Class "C" Partners:
0%
3. The parties agree that the reorganization of PRA into PRL did not effect a termination of the partnership for Federal income tax purposes. ↩